**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Delbert MOBLEY, Defendant–Appellant.**

**No. 93–5091.**

United States Court of Appeals,
Fourth Circuit.

Argued April 14, 1994.

Decided Nov. 23, 1994.

**ARGUED:** James Christopher Savage, Rockville, MD, for appellant. Andrew Gerald McBride, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty., Marcus J. Davis, Asst. U.S. Atty., Alexandria, VA, for appellee.

Before ERVIN, Chief Judge, SPROUSE, Senior Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Senior Judge SPROUSE joined. Senior Judge HARVEY wrote a concurring opinion.

## OPINION

ERVIN, Chief Judge:

Delbert Mobley was indicted under 18 U.S.C. § 922(g)(1) as a felon in possession of a firearm. His suppression motions failed, his case proceeded to trial and he was convicted. The government moved to have him sentenced as a career . criminal under 18 U.S.C. § 924(e). While the court was reluctant to give such a sentence on the facts of the case, believing it had no choice because the facts fit the statute, it sentenced Mobley to the mandatory minimum of 15 years in prison. Mobley now appeals on both the suppression matter and the construction of the armed career criminal provision. For the reasons set forth below, we affirm.

## I.

On December 5, 1990, at approximately 8:30 a.m., FBI special agents arrived at Mobley's apartment in Falls Church, Virginia with arrest and search warrants. The arrest warrant charged Mobley with conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846. According to the government, both warrants were supported by wiretap evidence and statements of confidential informants indicating that Mobley was involved in a large-scale crack cocaine distribution ring centered in Baltimore.

The FBI personnel at the scene were approximately eight, two to arrest Mobley, and five or six to execute the search of the premises. An agent knocked on Mobley's door, and he responded from within. The agent identified himself and indicated that he had a warrant for Mobley's arrest. Mobley opened the door, and as he did so one of the agents secured him against the wall while the others made a security sweep of the apartment to see that there was no one else present. Once they determined that Mobley was alone, the officers seemed to relax. Mobley had answered the door naked, and it was quite apparent that he was unarmed. Deborah Martin, one of the special agents assigned to arrest Mobley, advised him that he was under arrest. He then went into the other room, apparently under surveillance, and got dressed. After he returned to the living room area, Martin read him his *Miranda* rights. Mobley indicated that he understood his rights, and that he wished to speak to a lawyer.

The detail of what happened next is not exact. At the suppression hearing, Martin indicated, vaguely, that after this point,

> there was *general conversation* [impliedly with Mobley] about leaving the apartment, and I also asked him if there was anything in the apartment and specifically any weapons that were in the apartment that could be of danger to the agents who

would be remaining at the apartment to conduct the search warrant.

J.A. 36 (emphasis supplied). At trial, Martin was more precise:

> I told him, again, we would be leaving the apartment because he was under arrest, and I indicated that there would be people there who would stay and conduct a search warrant of his place. At that time I asked him if there was anything in the apartment that could be of danger to the agents who would be staying to conduct the search warrant, such as a weapon.

J.A. 101. In response to the question, Mobley stated that there was a weapon in the bedroom closet on one of the shelves, and he led the agents to it.

Mobley eventually was indicted on two counts involving drugs in the District of Maryland, and proceeded to trial on November 4, 1991. He was acquitted on both counts on April 10, 1992. Having lost the first round, the government came back for a second round. On July 22, 1992, the Grand Jury for the Eastern District of Virginia returned an indictment in one count against Mobley, charging him as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mobley filed a number of pretrial motions, including a motion to suppress for violation of *Miranda v. Arizona* and its progeny based on Martin's question as to whether there were any dangerous devices or guns in the house following Mobley's election to claim his right to counsel. The motion was denied, under the reasoning that the question fell within the "public safety exception" enunciated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

Mobley went to trial on the felon in possession charge and was convicted. Having provided proper notice, the government moved to have Mobley sentenced under the armed career criminal provision of 18 U.S.C. § 924(e)(1). Application of this sentence enhancement provision was based on Mobley's three prior felony convictions in the District of Columbia under its broad "robbery" statute, D.C.Code § 22–2901. The third of these convictions was essentially a pickpocketing offense, and Mobley argued that it did not fit the statutory definition of a violent felony.

The district court rejected the approach urged by Mobley (and adopted by the D.C.Circuit) in a published opinion, *United States v. Mobley*, 818 F.Supp. 164 (E.D.Va. 1993), and sentenced him to the mandatory minimum of 15 years.

## II.

### A.

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established a prophylactic procedural shield to support every citizen's Fifth Amendment right against compelled self-incrimination. Part of this shield is the requirement that, prior to any custodial interrogation, the police advise the individual that he has the right to remain silent and the right to the presence of an attorney. *Id.* at 479, 86 S.Ct. at 1630. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court held that, where a person subject to the *Miranda* requirements claims his right to speak to an attorney, the accused

> is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. at 1884–85. In the present case, it is clear that Mobley had exercised his right to speak to an attorney prior to Martin's questioning regarding the presence of a weapon on the premises, and that, absent some exception, the rule of *Edwards* would require a court to suppress this statement. In response, the prosecution argues that there is an applicable "public safety" exception to the rule of *Edwards*. This is a question of first impression in this circuit.

In *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), two police officers on patrol encountered a woman who stated that she had just been raped by a man with a gun, and that he had gone into a nearby grocery store. The police entered the store and saw a man fitting the suspect's description approaching the check-out counter. When the suspect saw the police, he

dropped his items and fled into the aisles. When he was caught and frisked, it was discovered that he had an empty shoulder holster. Before he was advised of his *Miranda* rights, the police asked him where the gun was, and he indicated to them where he had put it.

■ The Supreme Court acknowledged that this questioning violated *Miranda*, but went on to carve out an exception to the *Miranda* rule.

> The police, in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657, 104 S.Ct. at 2632. The Court recognized that the administration of the *Miranda* warnings in this situation might deter some people from answering. It reasoned that, while "when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost," *id.*, under the circumstances of this case, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* It is also clear that the exception applies not only to protect the public safety but also police safety as well, and that the exception is not to be analyzed in light of the subjective motive of the questioner but rather from the objective perspective of the presence of a public danger. *Id.* at 655–56, 659, 104 S.Ct. at 2631–32, 2633.

Thus, *Quarles* stands for the existence of a

'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. *Id.* at 655–56, 104 S.Ct. at 2631–32. In the present case, the question is whether this "public safety" exception *prior* to the administration of the *Miranda* warnings should be recognized *after Miranda* warnings are given and the right to counsel claimed. Only one circuit has addressed this question. In *United States v. DeSantis*, 870 F.2d 536 (9th Cir.1989), the Ninth Circuit, faced with facts quite similar to those of the present circumstances, examined the reasoning behind *Quarles* regarding the concern for public safety and stated that

> [t]his reasoning would apply with equal force to the procedural safeguards established when the accused asks for the aid of counsel. Society's need to procure the information about the location of a dangerous weapon is as great after, as it was before, the request for counsel.

*Id.* at 541. It therefore held that, absent evidence of actual coercion by the arresting officers, such questions should not be suppressed. *Id.*

■ We agree with the Ninth Circuit that the "public safety exception" to the *Miranda* framework should be recognized under the present circumstances. While the reasoning of *Quarles* is not on all points with the situation in which the accused has claimed his right to counsel,[1] the danger to the public and police from hidden traps and discarded weapons is as evident after the *Miranda* warnings have been given as before, and

> [t]he same considerations that allow the police to dispense with providing *Miranda* warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel.

---

1. The opinion in *Quarles* is rather narrowly tailored; central to its reasoning was that the administration of *Miranda* warnings would possibly deter the person in custody from responding to a question prompted by concerns for public safety,

thus justifying the exception to the *Miranda* requirement. Of course, the deterrence approach is not applicable once the *Miranda* warnings have been given.

*Id.* For this reason, we hold that the public safety exception articulated in *Quarles* will apply in an *Edwards* situation as well.

 Nevertheless, it is imperative that the scope of this exception be recognized and followed. *Quarles* is an *exception* to the *Miranda* rule, and its exceptive nature is evident throughout the opinion. *See, e.g., Quarles,* 467 U.S. at 653 n. 3, 104 S.Ct. at 2630 n. 3 ("[W]e conclude today that there are limited circumstances where the judicially imposed strictures of *Miranda* are inapplicable."); *id.* at 655, 104 S.Ct. at 2631 ("We hold that on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence...."). As an exception, it must be construed narrowly. As the *Quarles* Court indicated, the "public safety" exception applies only where there is "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 659 n. 8, 104 S.Ct. at 2633 n. 8. Absent such circumstances posing an objective danger to the public or police, the need for the exception is not apparent, and the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper.[2]

No such danger is apparent in the present case. As noted, Mobley was encountered naked; by the time he was arrested, the FBI already had made a security sweep of his premises, and they had found that he was the sole individual present, and that the apartment was a residence for Mobley alone. As he was being led away, an FBI agent asked him whether there were any weapons present. These facts contrast sharply with those of *Quarles,* and we are persuaded that they fall without, rather than within, the exception

*Quarles* recognized. There is nothing that separates these facts from those of an ordinary and routine arrest scenario. There was no explanation at any time as to what extraordinary circumstances prompted this question, and we must conclude that there were none. Although we believe that the public safety exception is a valid and completely warranted exception to the *Miranda* and *Edwards* rules, we are persuaded that there was no demonstration of an "immediate need" that would validate protection under the *Quarles* exception in this instance. Absent an objectively reasonable concern for immediate danger to police or public, we must follow the rule, not the exception.

### B.

Because the questioning was in violation of *Edwards,* it remains for us to consider whether the conviction can stand. We believe that it can.

 Under the exclusionary rule, Mobley's answer to the FBI agent's questioning regarding the presence of a weapon should not have been admitted at trial. *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). Although the "fruit of the poisonous tree" doctrine would suggest that the gun to which Mobley then led the police as a direct result of the questioning also should not have been admitted, *see Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in this instance the FBI had a search warrant for Mobley's residence and at least five agents were on hand to execute the search. Both the government and Mobley agree that discovery of the gun would have been inevitable. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

---

2. The government suggests in the proceedings below and on appeal what approaches a *per se* position as to questioning people in custody on narcotics charges. Absent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public; each case must be examined on its own facts to determine whether the deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place. Such an approach, which clearly follows the lead of *Quarles,* should fairly balance the general need to bolster Fifth Amendment rights through a faithful adherence to the prophylactic rules of *Miranda* while recognizing the exceptional circumstances that will justify the occasional departure in order to protect police and public alike from objectively reasonable danger of harm.

■ Since Mobley's statement ultimately was introduced at trial, it remains for us to determine whether the error was harmless beyond a reasonable doubt. *United States v. Khan,* 993 F.2d 1368, 1376 (9th Cir.1993); *United States v. Throneburg,* 921 F.2d 654, 658 (6th Cir.1990). In this instance, a review of the evidence introduced at trial convinces us that the government has demonstrated the harmlessness of the error. Mobley was the sole occupant of the apartment; it was leased in his name, and only one parking spot was leased for it. Although it was a two bedroom apartment, only one bedroom was furnished, and there was no other location that could accommodate a sleeping individual. The gun was located amid Mobley's sweaters in a clothes closet adjoining the single utilized bedroom. Further, although Mobley attempted to demonstrate evidence that the gun was placed in his belongings by a nephew during a recent visit, we believe that the government's evidence also makes this theory untenable. Thus, despite the violation of the *Edwards* rule, we believe the introduction of the impermissible material was harmless beyond a reasonable doubt and that Mobley's conviction as a felon in possession of a firearm must be affirmed.

## III.

■ Defendants who are convicted as felons in possession of a weapon can, under certain circumstances, be subjected to a significant mandatory minimum sentence for being armed career criminals. Mobley's counsel presents a forceful and well-stated argument, for which he should be commended, against the appropriateness of imposition of a mandatory minimum sentence in the present circumstances. Nevertheless, we believe a faithful adherence to the statute and Supreme Court precedent disclose that such sentence was proper.

The text of the mandatory minimum statute is as follows:

In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years

. . . .

18 U.S.C. § 924(e)(1). The question is whether the defendant has the three predicate acts required for the mandatory minimum to apply. In the present case, the question is whether Mobley has committed three "violent felonies." "Violent felony" is defined as:

any crime punishable by imprisonment for a term exceeding one year . . . that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

Mobley has only three relevant convictions, all from the District of Columbia in the mid- to late–1970s. The first conviction, in 1975, was for assault with intent to rob. He concedes that this meets the definition of subpart (i) of the definition. His remaining two convictions, in 1975 and 1978, were for violation of D.C.Code § 22–2901, which, at the relevant time, stated:

Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than two years nor more than fifteen years.

As the district court recognized, see *United States v. Mobley,* 818 F.Supp. 164, 165 (E.D. Va.1993), the definition facially appears to fall within the scope of subpart (i) because of the requirement of "force or violence." The "force" the D.C. statute requires, however, as the district court also noted, is merely the "*de minimis* force directed at the stolen *property* rather than force directed at the *person* of the victim" necessary to remove the property from its place. *Id.* Thus, the

statute does not fall within subpart (i) because it does not have as an element "the use, attempted use, or threatened use of physical force against the person of another."

The court then proceeded to determine that Mobley's offense fits within subpart (ii). Mobley objects to that determination. In his mind, subpart (ii) applies only to property crimes rather than crimes against the person:

> The intent of the Congress was to broaden the classification of violent felonies, including property crimes. Congress specified several property crimes, burglary, arson, or extortion, involving the use of explosives and then added language intended to be applied to other property crimes that presented serious potential risk of physical injury to another.

Appellant's Br. at 14. Mobley cites *United States v. Mathis*, 963 F.2d 399 (D.C.Cir. 1992), in support of his position. In that case, the District of Columbia Circuit, construing the same D.C. statute that is before this court, interpreted subpart (i) to include "felonies against the *person* that have as an element the use or threat of physical force," *id.* at 405 (emphasis in original), while subpart (ii) includes only "felonies against *property* (such as burglary, arson, extortion, etc.) that present a serious potential risk of physical injury." *Id.* (emphasis in original).

It also should be noted that this court gave this approach support in brief dicta in *United States v. Headspeth*, 852 F.2d 753 (4th Cir. 1988), a case that was later overruled by *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). *Headspeth* required the court to determine whether storehouse breaking under Maryland law fit within the violent felony definition. Because the statute clearly was not within subpart (i), the court scrutinized subpart (ii). After detailing the legislative history of the provision, particularly as to the robbery language,[3] the opinion lays out the present language of § 924(e)(2)(B), and then notes that

[t]he § 924(e)(2)(B)(ii) catch-all, which permits certain *felonies against property* to serve as the basis for sentence enhancement, was designed to satisfy the proponents of H.R. 4639, while the limitations of that provision to crimes which present a serious risk of injury to the *person* was a concession to those who favored H.R. 4768.

*Headspeth*, 852 F.2d at 758 (emphasis supplied).

Since *Headspeth*, however, the Supreme Court weighed in with *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). That case addressed the same question as *Headspeth*, i.e., how to determine whether a state burglary statute meets the "burglary" provision of subpart (ii). The Court agreed that it would be unfair simply to rely on the fact that a state called something burglary, since different states define that crime differently; instead, the Court attempted to formulate a "generic" burglary definition against which a state statute, or the indictment or jury charge in a particular case, could be measured. Taylor argued for a "generic" definition of burglary that included as an element necessary for conviction conduct that presents a serious risk of physical injury to another, tracking the language of subpart (ii)'s catch-all. The Court squarely rejected that approach, reasoning that it would make the enumerated crimes of subpart (ii) mere surplusage. According to the Court, "if this were Congress' intent, there would have been no reason to add the word 'burglary' to § 924(e)(2)(B)(ii), since that provision already includes *any* crime that 'involves conduct that presents a serious potential risk of physical injury to another.'" *Id.* at 597, 110 S.Ct. at 2157 (emphasis in original). It is important to note that the Court stated that it was not just property crimes that fall within the catch-all, but rather "*any* crime"; and it underlined the *any*, which suggests that it was not a mere slip of the tongue in throwaway *dicta*.

---

3. The law originally only made robbery and burglary predicate offenses, and included a definition for each. That law was later repealed and replaced with the current provision, which does not include any definitions for the enumerated crimes (burglary, arson, extortion). What "sort" of burglary fit within subpart (ii) thus became a major concern in the courts, and led the Supreme Court to enter the fray in *Taylor*.

We note that a straightforward reading of the statute indicates such a result. The statute defines violent felony as:

*any crime* ... that—

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

While it is possible to infer a property restriction into the structure of the statute, a plain reading of the words suggests that it covers any crime of various enumerated types, and also those crimes of whatever variety that involve conduct that presents a serious potential risk of physical injury to another.

Given this construction, it is necessary to determine whether pickpocketing fits the definition. "[T]he courts must necessarily make common-sense judgments about whether a given offense proscribes generic conduct with the potential for serious physical injury to another." *United States v. Custis,* 988 F.2d 1355, 1363 (4th Cir.1993), *aff'd on other grounds,* —— U.S. ——, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). In *Custis,* the court held that attempted breaking and entering met that requirement because of the "substantial risk of confrontation" inherent in such a crime involving a dwelling. *Id.* at 1363–64.

Similarly, we believe that insofar as the D.C. statute outlaws pickpocketing "by sudden or stealthy seizure or snatching ... from the person or immediate actual possession of another," the offense has the requisite potential for serious physical injury to another. As the quotation indicates, the statute requires that the taking be "from the person or immediate actual possession of another." Thus, whenever the pickpocketing fails and the criminal is detected, a confrontation is likely, and the stealthy pickpocketing can progress into something far uglier. This is not an abstract hypothetical, as Mobley discloses in his brief:

In fact, two of the three predicate offenses used by the District Court below were crimes which were initiated as pickpocketing offenses, but developed, at least in one instance, into a robbery offense.

This concession points up the fact that the crime is one that can be considered to "present a serious risk of physical injury to another." This being the case, we believe that the armed career criminal provision applies in these circumstances and that we must affirm Mobley's sentence.

## IV.

For the reasons set forth above, we affirm.

*AFFIRMED.*

ALEXANDER HARVEY, II, Senior District Judge, concurring in the judgment:

I am in agreement with the majority that appellant's conviction and sentence should be affirmed. I fully concur with the majority's conclusion in Part III of the opinion that the armed career criminal provision applies in the circumstances here and that Mobley's sentence should be affirmed. I would also affirm the judgment of conviction, but for reasons different from those set forth in the opinion.

I do not believe, as the majority has held in Part II–A of the opinion, that *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) should be construed as narrowly as indicated nor that the questioning of Mobley by the FBI agent was in this case in a violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). I would therefore affirm the district court's denial of Mobley's motion to suppress his statement and would affirm this conviction on that ground rather than on the ground of harmless error.

Although *Quarles* is an exception to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it is an important one when considered in terms of police and public safety. As stated in *Quarles,* the doctrinal underpinnings of *Miranda* do not require "that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." 467 U.S. at 656, 104 S.Ct. at 2632. As noted in *Quarles,* "police officers can and will distinguish almost instinctively between questions necessary to secure their

own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." 467 U.S. at 658–659, 104 S.Ct. at 2633. The *Quarles* exception was defined in the following terms:

> The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate interests when confronting situations presenting a danger to the public safety. *Id.* at 659, 104 S.Ct. at 2633.

As the majority has held, the *Quarles* exception applies only where there is "an objectively reasonable need" to protect the public or police. In this case, the trial court, after receiving evidence and hearing argument on Mobley's motion to suppress, determined that there was indeed an objectively reasonable need for protection of the agents making the arrest and of the public. Special Agent Martin testified at the suppression hearing that she directed her question to Mobley because she feared that there might be weapons or booby traps in the apartment which could harm the agents during the search. As she testified, it is not uncommon for a crack cocaine dealer to retain a booby trap type weapon in his apartment to protect against one who might try to burglarize him.[1] In holding that the *Quarles* exception applied, the district court specifically found that the agent knew that drug dealers do booby trap their apartments so that they can protect their stash of drugs and cash and that the agent, because of her own safety and her desire to protect other agents from firearms, addressed the question to Mobley to ascertain whether there were weapons or other dangerous firearms in the apartment. These findings were not clearly erroneous and would, I believe, support the district court's determination that an objectively reasonable need existed here to protect the police and the public from danger resulting from firearms or weapons being in the apartment.

This Court and other courts have long recognized that drug dealers use firearms to protect their narcotics and the large amount of cash in their possession. In *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir.1994), this Court said:

> To begin with, "the law has 'uniformly recognized that substantial dealers in narcotics possess firearms' " and that "entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers." *[United States v.] Bonner*, 874 F.2d [822] at 824, 827 [(D.C.Cir.1989)] (quoting *United States v. Payne*, 805 F.2d 1062, 1065 (D.C.Cir. 1986)); *see also Singer*, 943 F.2d at 763 (noting the "federal judiciary's recognition that firearms are an integral part of the drug trade").

*See also, United States v. Coslet*, 987 F.2d 1493, 1495 (10th Cir.1993) ("Guns are a ubiquitous part of the drug trade, facilitating transactions by providing protection to dealers, drugs and money."); *United States v. Young–Bey*, 893 F.2d 178, 181 (8th Cir.1990) ("The presence and availability of firearms are often crucial to the 'sources' of the drug enterprise."); *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.) ("Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade"), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

I would agree with the majority that *Quarles* does not compel a *per se* approach and that each case must be examined on its own facts to determine whether the exception is justified. But in this particular case, as in *Quarles*, "we have before us no claim that [appellant's] statements were actually compelled by police conduct which overcame his will to resist." 467 U.S. at 654, 104 S.Ct. at 2630–31. No evidence was presented at the suppression hearing that the agents were conducting a fishing expedition or were otherwise attempting to avoid the strictures of *Miranda*. Certainly, if evidence of this sort were credited by a trial court, the *Quarles* exception should not be applied.

The majority opinion cites with approval *United States v. DeSantis*, 870 F.2d 536 (9th Cir.1989), but adopts as the law of this Cir-

---

1. Although Mobley was later acquitted when the narcotics charges came on for trial, the agents clearly had probable cause to believe that he had drugs and money on his premises connected to a large scale crack cocaine operation.

cuit a much narrower rule than that recognized by the Ninth Circuit. As the majority opinion notes, the Ninth Circuit in that case was faced with facts quite similar to those here. Based on circumstances similar to those before the district court in this case, the Ninth Circuit viewed the totality of the facts objectively and, concluding that the agent's question was not intended to elicit testimonial evidence but rather to secure the officer's own protection, held that the statements and the firearm were properly admitted into evidence at the trial. 870 F.2d at 541. I would follow *DeSantis* in its entirety and would, as did the Ninth Circuit in that case, affirm the trial court's denial of the defendant's suppression motion.

Except as discussed herein, I am in agreement with the remainder of the majority opinion, and I therefore join in holding that Mobley's conviction and sentence should be affirmed.[2]

---

2. In particular, I agree that even if Mobley's response to the agent's questioning had been erroneously admitted at trial, the error was harmless beyond a reasonable doubt.