810 So.2d 552 (2002)
STATE of Florida, Appellant,
v.
Dustin Sebastian ALEXANDER, Appellee.
No. 5D01-1423.
District Court of Appeal of Florida, Fifth District.
February 22, 2002.
*553 Robert A. Butterworth, Attorney General, Tallahassee, and Kellie A. Nielan, Assistant *554 Attorney General, Daytona Beach, for Appellant.
Franklin T. Walden of Law Offices of Franklin T. Walden, Altamonte Springs, for Appellee.
ORFINGER, R.B., J.
The State appeals from an order suppressing certain statements made by the defendant, Dustin Alexander, as well as certain tangible evidence. We reverse.
The State does not challenge the factual findings made by the trial court. Rather, the State maintains the court's ruling amounts to an erroneous application of law subject to de novo review. See Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Williams v. State, 788 So.2d 334 (Fla. 5th DCA 2001). The facts found by the court in the suppression order are:
1. The Defendant was arrested in this case for robbery with a firearm, a first-degree felony punishable by life. The arrest occurred at the conclusion of a police interview conducted at the home of the Defendant.
2. Upon the arrest, the officer [Smith] spoke to the father of the Defendant, who was very agitated over his son's involvement in the robbery, about "the issue of the firearm." The father told the officer that "[he] would find the gun," and, in the officer's presence, asked the Defendant about the location of the gun. The Defendant told his father and the officer where the gun was located.
3. After recovering the gun, the Defendant was taken to the police station where he waived his constitutional rights and gave a second statement.
4. The Court has reviewed the tape-recorded statements that were entered into evidence as Exhibits "B" and "C".
5. This Court finds that the original statement, taken at the house of the Defendant, is not subject to suppression pursuant to this motion. For the following reasons, the court finds that it was not given as a result of coercion:
a. The officer was dressed in plain clothes, without his firearm or handcuffs.
b. The officer did not restrict the movement of the Defendant or make it so that he was not free to leave the room.
c. Miranda warnings were not necessary, as the Defendant was not in custody.
d. The investigative techniques used by the officer did not create a coercive atmosphere.
e. The officer had requested and received permission to interview the Defendant at least 30 minutes before arriving at the Defendant's home.
6. This Court finds that the statements made after the physical arrest of the Defendant and the recovery of the firearm are subject to suppression. For the following reasons, the Court finds that these statements and the firearm were obtained as the result of a coercive atmosphere:
a. The Defendant was in police custody.
b. The Defendant had not been given meaningful Miranda warnings, as they were not read from the officer's Miranda card.
c. The Defendant was only 18 years of age at the time of the arrest, and he was living in his parents' home, where the arrest occurred.

*555 d. Originally, it was not the officer's intention to take the Defendant into custody by way of arrest after the Defendant's confession at the home. However, upon leaving the room where the interview was conducted, the Defendant's father asked the officer whether the Defendant was "involved." When the officer advised that he was, the father ordered the officer to "get him out of here." The father's expressions of anger and disappointment in his son made the arrest necessary to prevent potential harm to the Defendant. The officer had to step in between the father and the Defendant in order to prevent a physical attack upon the Defendant. The court had the opportunity to observe the relative physical size of the father and the Defendant. The father is a large, physically well-built individual and the Defendant is a slim, young man who was in handcuffs and could not have defended himself.
e. At the time of the arrest, the officer believed that the gun had been abandoned in a nearby lake after the robbery. When he made a statement about "the issue of the firearm" to the father, the officer planned to take the Defendant to the lake to determine the location of where the gun had been abandoned. Instead, he accepted the father's "assistance" when the father stated that "[he] would find the gun" without first advising the Defendant of his Constitutional rights. This "assistance" came immediately following the physical confrontation and while the Defendant was handcuffed in the room with his father. The demeanor of the officer at the time that he testified that the father said "[he] would find the gun" left no other interpretation than that the father would force the Defendant to tell the officer where the gun was located. The effectiveness of the father's coercive posturing cannot be denied in that the Defendant initially lied to the officer, until his father's overt threatening acts forced him to tell the truth and reveal that the firearm was under his mattress and not in the lake.
f. Although the officer did not intentionally recruit the father to find the location of the gun, his statement to the father about the "issue of the firearm" and the father's statement, made in anger, that "[he] would find the gun," in addition to the coercive atmosphere discussed above, made the Defendant's revelation of the location of the gun in his bedroom, and not in the lake, involuntary as the result of coercion. Instead of separating the Defendant from his father, the officer obtained the benefit of the father's coercion in forcing the Defendant to reveal the true location of the firearm, something the officer would not have been allowed to do himself.
7. Because the Defendant was given proper Miranda warnings, which rights were validly waived, the statement given at the police station is not subject to suppression pursuant to this motion.
8. Although the Court considered striking the testimony of the Defendant, the Court did, in fact consider this testimony when making this ruling.

*556 9. The firearm recovered by law enforcement from the bedroom of the Defendant on January 22, 2001 and the statements made by the Defendant at his house after his physical arrest are hereby suppressed. The motion is hereby denied as to all statements made to Officer Smith at the Defendant's house prior to the physical arrest and all statements made at the police station.
(Emphasis in original).
The duty of a law enforcement officer to inform a suspect of Miranda rights arises when custodial interrogation begins. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Davis v. State, 698 So.2d 1182 (Fla.1997). A suspect is in custody "if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest." Ramirez v. State, 739 So.2d 568, 573 (Fla.1999). See Mansfield v. State, 758 So.2d 636 (Fla.2000).
The main thrust of the State's position is that the defendant, though in custody, was not subjected to interrogation or its functional equivalent so Miranda warnings were not required and the firearm and statements are admissible. The defendant counters that complete Miranda warnings were not given to him after his arrest despite Officer Smith's post-arrest announcement that there is still "the issue of the firearm."[1] Combined with the defendant's father's coercive pressure on his son to "find the gun" and the officer's participation and acquiescence in the father's efforts, the defendant maintains the evidence was obtained in violation of established constitutional strictures.
The purpose of Miranda warnings is to prevent government officials from using "the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." Arizona v. Mauro, 481 U.S. 520, 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). While there is no dispute that the defendant was in custody at the time the suppressed statements were made, the real issue is whether the defendant was questioned by Officer Smith or was subjected to the functional equivalent of questioning.
In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court explained that interrogation occurs when an individual in custody is subject to express questioning or its "functional equivalent" by a state agent. Id. at 300, 100 S.Ct. 1682. See Traylor v. State, 596 So.2d 957, 966, n. 17 (Fla.1992). This "functional equivalent" concept connotes "any word or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know is reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 100 S.Ct. 1682. The latter portion of the functional equivalent test focuses "primarily upon the perceptions of the suspect, rather than the intent of the police." Id. at 301, 100 S.Ct. 1682. While focusing on the suspect's perceptions, the intent of the police officer may be relevant particularly when a police practice is "designed to elicit an incriminating response," and the intent of the police may bear on the question of whether the "police should have known that their words or actions were reasonably likely to evoke an incriminating response." *557 Id. at 301, n. 7, 100 S.Ct. 1682. More specifically, the Supreme Court said:
[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Id. at 301-02 100 S.Ct. 1682 (emphasis in original) (footnotes omitted).
Applying that standard to the facts of this case requires us to determine if Officer Smith should have known that his statement was reasonably likely to elicit an incriminating statement from the defendant. See Mauro, 481 U.S. at 529, n. 6, 107 S.Ct. 1931. Officers do not interrogate a suspect simply by hoping that the suspect will incriminate himself. Id. at 529., 107 S.Ct. 1931 We believe that concluding that Officer Smith's comment was likely to elicit an incriminating response from the defendant assumes too much.[2] Smith's comment, the father's question, and the son's response all occurred within just a few seconds. There is no evidence that Officer Smith made his statement for the purpose of eliciting an incriminating statement nor is there any evidence that the defendant was subjected to psychological pressure or direct questioning by the police, at least as it relates to the suppressed statements. There was also no evidence indicating that Officer Smith engaged in a conscious design to create an "interrogation *558 environment" when the suppressed statements were made. See United States v. Vazquez, 857 F.2d 857, 863 (1st Cir. 1988). Thus, the defendant's statement in response to his father's question should not be considered the result of police interrogation. Accordingly, on this record, we conclude that the trial court erroneously applied the law and that the defendant's statements and the tangible evidence should not be suppressed.
Finally, the State urges that the "public safety" exception to Miranda should be invoked. This exception was recognized in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and was applied recently in Borrell v. State, 733 So.2d 1087 (Fla. 3d DCA 1999). In Quarles, the police were informed that an armed man who had moments before committed a sexual battery had entered a nearby store. When the man was apprehended and handcuffed minutes later, he was not armed. Before issuing Miranda warnings the arresting officer asked him where the gun was, and the man indicated in an area of some empty cartons. In affirming the denial of the motion to suppress, the court stated:
[T]here is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.
* * *
Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety.
* * *
We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.
* * *
The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.
Quarles, 467 U.S. at 655-59, 104 S.Ct. 2626.
In Borrell, the defendant shot and killed a co-worker and within minutes was apprehended and handcuffed. Because he was unarmed, the arresting officer, before Mirandizing the defendant, asked him where the gun was and the defendant led the officer to the gun, which was under a tarp on a nearby boat. The denial of the defendant's motion to suppress was affirmed under Quarles. Borrell, 733 So.2d at 1087.
The instant case does not present the imminent concern for public safety present in Quarles and Borrell. Officer Smith did not even intend to arrest the defendant until the defendant's father said to "get him out of here." The officer had been told the gun had been abandoned in a lake. While the officer may not have believed this, there is no indication of any imminent concern for the public safety.
REVERSED AND REMANDED.
THOMPSON, C.J., concurs.
COBB, J., dissents, with opinion.
*559 COBB, J., dissenting.
In considering whether express questioning or its "functional equivalent" exists, the inquiry focuses on "any word or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know is reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The functional equivalent test focuses "primarily upon the perceptions of the suspect, rather than the intent of the police." Id. While focusing on the suspect's perceptions, the intent of the police officer may be relevant particularly when a police practice is "designed to elicit an incriminating response," and the intent of the police may bear on the question of whether the "police should have known that their words or actions were reasonably likely to evoke an incriminatory response." Id. at 301, n. 7, 100 S.Ct. 1682. Additionally,
any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminatory response from the suspect.
Id. at 302, n. 8, 100 S.Ct. 1682.
The trial court's factual findings, which are unchallenged, reflect that the defendant's father was angry when he learned his son was involved in criminal conduct and demanded his son's immediate arrest. Officer Smith had to step between the two to prevent the father from physically attacking his son. While Officer Smith denied using the father to try and learn from the defendant the location of the gun, why else would the officer have announced "there's the issue about the gun, I need to find the gun"?[3] Indeed, moments after the officer's announcement the father turned to his handcuffed son and said "boy, where's the gun?" Officer Smith knew of the particular susceptibility of the defendant to the "persuasive powers" of his father and should have known that his question, though ostensibly directed to the father, was reasonably likely to elicit an incriminatory response from the son.
Officer Smith's inexplicable failure to properly Mirandize the defendant following his arrest requires suppression of the firearm. The suppression order should be affirmed.
NOTES
[1] The actual statement made by Officer Smith was, "one thing we're doing now is to go out and try to locate this gun because it's an issue." The defendant initially told Smith that he threw the gun in a lake. Although Smith doubted the story, he intended to drive the defendant to the lake to point out where the gun was discarded.
[2] We recognize that the State cannot avoid constitutional restrictions by using a private individual, such as the defendant's father, as its agent, nor can it claim that only a private act is involved when government officers, subject to constitutional limitations, have participated in the act. Under such circumstances, the constitutional restrictions on governmental activity cannot be said to be inapplicable. See People v. Jones, 47 N.Y.2d 528, 419 N.Y.S.2d 447, 393 N.E.2d 443 (N.Y. 1979). However, we do not believe that defendant's father was acting as a state agent. The test for determining whether private individuals are agents of the government is whether, in consideration of all the circumstances, the individuals acted as instruments of the State. See Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). To determine whether a private individual acts as an instrument of the state, courts look to (1) whether the government was aware of and acquiesced in the conduct; and (2) whether the individual intended to assist to the police or further his own ends. See United States v. Cleaveland, 38 F.3d 1092, 1093 (9th Cir.1994); State v. Iaccarino, 767 So.2d 470, 475 (Fla. 2d DCA 2000). Nothing in the record before us suggests that the defendant's father was acting as an agent of the State measured by the standards outlined above. To the contrary, the defendant's father was upset and disappointed in his eighteen-year-old son. Like any responsible parent, he wanted the truth from him.
[3] Officer Smith candidly testified that he did not think that the father himself knew of the whereabouts of the gun.