IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

STATE OF FLORIDA,

      Appellant,

 v.                                   Case No.  5D14-2702

DAVID VINCENT MALONEY,

      Appellee.

_____/

Opinion filed May 13, 2016

Appeal from the Circuit Court
for Seminole County,
Marlene M. Alva, Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and L. Charlene Matthews,
Assistant Attorney General, Daytona
Beach, for Appellant.

Michael H. LaFay, Orlando, for Appellee.


BERGER, J.

The State of Florida timely appeals the trial court's order granting David Maloney's

motion to suppress certain statements he made to police before he was advised of his

Miranda[1] rights.  Because we conclude the public safety exception to the Miranda

requirement permits the admission of Maloney's statements, we reverse.

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Maloney was a member of a motorcycle gang known as the Philly Warlocks. On September 30, 2012, the Philly Warlocks were holding a poker run departing from the parking lot of the Veterans of Foreign Wars ("VFW") hall in Winter Springs. At about 10:30 a.m., a shootout ensued between the Philly Warlocks and members of a rival gang, the Florida Warlocks, in the parking lot of the VFW. Soon thereafter, police responded.

Officer Bradley Dula was the first to arrive at the VFW. Once on scene, he saw several persons spread throughout the parking lot, some of whom were severely injured or dead.[2] Officer Dula observed Maloney and another individual crouching in front of a small truck. Officer Dula advanced on them with his service firearm and ordered them to lay down on the ground. They complied immediately.

Officer Dula quickly realized that the situation was of a greater magnitude than his patrol officers could handle. He requested assistance, through dispatch, from all available officers and sheriff's deputies in Seminole County and neighboring jurisdictions. The dispatch request indicated that the shooting was still ongoing at the VFW.

As more law enforcement units arrived, the scene remained chaotic. In an effort to safely secure the scene, police handcuffed thirty to forty people, including Maloney, and directed them to lay face down on the ground. The police also roped off the VFW parking lot with crime-scene tape and controlled and logged access to the area.

Maloney was initially patted down and searched by Officer Nathan Ecalbarger of the Longwood Police Department. Officer Ecalbarger seized a .22 caliber derringer pistol and a double-edge fish blade knife from Maloney. Officer Ecalbarger placed the derringer

---

[2] Two members of the Florida Warlocks were found deceased in the parking lot. A third member later died at the hospital.

pistol and the knife near Maloney, but outside of his reach so they could later be collected and inventoried.[3]

Officer Dula and Officer Ecalbarger testified that Maloney and the other detainees were not placed under formal arrest during this process. Instead, they were placed in investigative detention to ensure the safety of the officers and the public. Maloney did not attempt to escape and was fully cooperative. According to Officer Dula, he had no evidence that Maloney was a suspect at this point.

Sgt. Brad Heath[4] of the Winter Springs Police Department testified that the scene was not completely secured when he arrived. He noticed a large number of weapons laid out on the sidewalk in front of the grassy area where the detainees were being held. Because he did not want the seized weapons remaining in the open, Sgt. Heath collected the seized property at a centralized location and had each detainee identify their property so the items could be placed in bags. About five to ten minutes after arriving on the scene, and about thirty minutes after Officer Dula first arrived, Sgt. Heath moved Maloney, who was still handcuffed, to the place where the seized property was collected and asked Maloney to identify any property belonging to him. In response, Maloney claimed ownership of the .22 caliber derringer pistol and the knife.

While talking to Maloney, Sgt. Heath noticed that Maloney was wearing an empty holster too large for the .22 caliber derringer. Based on his knowledge that members of

---

[3] The .22 caliber derringer pistol and the knife were suppressed on grounds not relevant to this appeal.

[4] Before he responded to the dispatch request, Sgt. Heath was performing surveillance on the Florida Warlocks and trailed some of the members who left the VFW before the shootout.

both of the Warlocks gangs typically carried more than one weapon, Sgt. Heath asked Maloney if he had any additional weapons that fit his empty holster.[5] Maloney told Sgt. Heath that he also had a .380 caliber Ruger pistol and gestured his head towards the area of the parking lot where he had dropped it during the shooting. Sgt. Heath testified that Maloney was not placed under arrest and, consequently, was not advised of his Miranda rights during this interaction. According to Sgt. Heath, he did not yet know whether Maloney was a victim or a suspect.

Maloney was held, in handcuffs, as an investigative detainee for approximately twelve hours. During that time, Maloney was uncuffed only for brief periods to drink water and participate in a gunshot residue test. Over the course of the day, the police narrowed their investigation from the group initially detained down to six persons, including Maloney. As the investigation progressed, all of the detainees were released except Maloney[6] and three others, who were later arrested and charged early the next morning.[7]

Prior to trial, Maloney filed a motion to suppress, among other things, the statements he made regarding his ownership of the .22 caliber derringer and the knife.[8]

---

[5] Another detainee that Sgt. Heath searched that day had a hidden .380 caliber firearm on his person that was missed during a previous search.

[6] Maloney was not read his Miranda rights until about 10 p.m. when police formally interviewed him about the shooting.

[7] Maloney was charged with three counts of second degree murder and two counts of attempted first degree premeditated murder. He was acquitted of the second degree murder charges and all but one charge of attempted first degree murder on which the jury could not reach a verdict. The state seeks to retry Maloney on the remaining count of attempted first degree murder.

[8] The motion to suppress did not specifically seek to suppress the .380 caliber Ruger pistol, but it sought to suppress the fruits of the previous search, the .22 caliber

4

He argued these statements were elicited in response to custodial interrogation without having first been advised of his Miranda rights. The trial court agreed and suppressed the statements. The State moved for reconsideration on the ground that the police were not required to give Maloney Miranda warnings based on the public safety exception established in New York v. Quarles, 467 U.S. 649 (1984). The trial court denied the motion,[9] concluding:

> [A]t the point where the Defendant was interrogated by Sergeant Heath regarding the empty holster, the exigency had largely dissipated. Approximately 30 minutes had passed since law enforcement had responded and all 30-40 people on scene had been secured, searched, and disarmed. . . . While it is certainly possible that the Defendant's gun had been tossed aside and not recovered, that theoretical possibility does not justify an expansion of the public safety exception. . . . In the instant case, the crime scene perimeter had been secured and everyone had been placed in custody, separated, and presumably disarmed. There was no longer any exigency that would justify this pre-Miranda questioning. Thus, this Court finds that the question regarding the holster was asked solely to elicit testimonial evidence from the Defendant, and was not justified by an immediate concern for public safety.

The State raises two arguments on appeal. First, the State contends that Maloney was not in custody when Sgt. Heath questioned him. Second, the State submits that Sgt. Heath's questions were intended to elicit responses that would locate an unaccounted-for firearm, which was an imminent threat, in order to protect both the officers on the scene and the public. Maloney counters that the trial court was correct in ruling that he

---

derringer pistol and the empty holster, which led Sgt. Heath to ask Maloney if he had another weapon.

[9] Initially the trial court also suppressed the .380 caliber Ruger pistol, but upon reconsideration it reversed its position, concluding police would have inevitably discovered it without Maloney's statement to Sgt. Heath.

was in custody when Sgt. Heath questioned him and that any exigency or emergency arising from the shootout dissipated because the scene was secured in the thirty minutes between the time Officer Dula arrived and detained Maloney and when Sgt. Heath questioned Maloney about his empty holster.

Under the Florida and United States Constitutions, each person is provided with the fundamental right of protection against being compelled to become a witness against himself or herself in criminal cases. U.S. Const. amend. V; art. I, § 9, Fla. Const.; Ramirez v. State, 739 So. 2d 568, 572-73 (Fla. 1999); Wright v. State, 161 So. 3d 442, 447 (Fla. 5th DCA 2014). In Miranda v. Arizona, the United States Supreme Court held that, under the Fifth Amendment to the United States Constitution, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Procedural safeguards include a warning that the person "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. at 444, 457, 467-68. The person must also be advised that he or she may request that an attorney be appointed if the person cannot afford to retain an attorney. Id. at 479. It is undisputed that Maloney was not given the Miranda warnings prior to making the admissions at issue.

A Miranda violation gives rise to a presumption of coercion that "is irrebuttable for the purposes of the State's case in chief." Wright, 161 So. 3d at 447 (citing Oregon v. Elstad, 470 U.S. 298, 307 (1985)). Evidence obtained from custodial interrogations may not be used against a defendant at trial if these warnings were not provided to the

6

defendant before the interrogation. Miranda, 384 U.S. at 479 ("[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."); see also Elstad, 470 U.S. at 306 n.1, 307; Wright, 161 So. 3d at 447.

Based on the totality of the circumstances, we conclude that Maloney was in custody for the purposes of Miranda because he was restrained to the degree usually associated with a formal arrest. See Howes v. Fields, 132 S.Ct. 1181, 1189-90, 1192 (2012); Ramirez, 739 So. 2d at 574; Monroe v. State, 148 So. 3d 850, 855 (Fla. 1st DCA 2014), remanded on other grounds, 41 Fla. L. Weekly S192, S194 n.2 (Fla. Apr. 28, 2016). Maloney was handcuffed for twelve hours; he was held under guard; he was searched before and during the questioning; some of his property had been seized; and he was not told he was free to leave.[10] Accordingly, we reject the State's contrary argument on this point and focus our attention on whether the public safety exception, established in New York v. Quarles, 467 U.S. 651 (1984), applies to this case. See State v. Ruiz, 526 So. 2d 171, 172 n.3 (Fla. 3d DCA 1988).

---

[10] A determination of whether a suspect is in custody under Miranda consists of two parts. The first part involves determining whether a reasonable person would have felt restrained in his or her freedom of movement to the degree associated with a formal arrest such that he or she was not free to terminate the interrogation and leave. See Miranda, 384 U.S. at 444-45; Fields, 132 S.Ct. at 1189; Ramirez, 739 So. 2d at 573. The second part involves deciding whether the interrogation "presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Fields, 132 S.Ct. at 1190; accord Johnson v. State, 800 So. 2d 275, 278 (Fla. 1st DCA 2001). We reach only the first part of this analysis because the State waived consideration of the second part when it did not raise it as an issue in its brief. See Doe v. Baptist Primary Care, Inc., 177 So. 3d 669, 673 (Fla. 1st DCA 2015) (quoting Polyglycoat Corp. v, Hirsch Distribs., Inc., 442 So. 2d 958, 960 (Fla. 4th DCA 1983)); see also Washburn v. State, 868 N.E.2d 594, 601 n.2 (Ind. Ct. App. 2007) (citing Dunaway v. Allstate Ins. Co., 813 N.E.2d 376, 387 (Ind. Ct. App. 2004)).

There are limited exceptions to the requirement that law enforcement read a suspect Miranda warnings before conducting a custodial interrogation. One such exception involves imminent threats to public safety. See Quarles, 467 U.S. at 651, 657 ("[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."). The availability of this exception does not depend on the individual officer's motivation. Id. at 655-56.

In Quarles, the Supreme Court was presented with facts similar to those we have here. Two officers were approached by a young woman who informed them she had just been raped at gunpoint by a man wearing a black jacket with the name "Big Ben" printed in yellow letters on the back. The woman told the officers that the man had just walked into a nearby supermarket with the gun. Id. at 652. One of the officers spotted the suspect, Benjamin Quarles, as he was approaching the checkout counter. Id. Quarles saw the officer and ran towards the rear of the store. Id. When the officer eventually caught up to Quarles, he ordered him to stop and place his hands over his head. Id. The officer frisked Quarles, handcuffed him, and discovered an empty shoulder holster. Id. The officer asked Quarles where the missing gun was located, and Quarles replied that the "gun is over there" while nodding towards its location. Id. The officer retrieved the gun and then read Quarles his Miranda rights. Id.

During the ensuing prosecution for illegal possession of a weapon, Quarles successfully moved to suppress the gun, as well as his statement regarding its location, because he was not given Miranda warnings before providing the statement. Id. at 652-53. The Supreme Court reversed, recognizing that the missing gun presented a threat to

8

the safety of the officers and to the public. Id. at 651 ("We conclude that . . . overriding considerations of public safety justify the officer's failure to provide Miranda warnings before he asked questions devoted to locating the abandoned weapon."). Justice Rehnquist wrote:

> We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

Id. at 657-58.

The public safety exception is "circumscribed by the exigency which justifies it." Id. at 658. For the public safety exception to apply, the threat must be imminent. See id. The imminence of the threat must be considered from the objective perspective of a reasonable person in the position of the officer at the time and without the benefit of hindsight. See State v. Alexander, 810 So. 2d 552, 558 (Fla. 5th DCA 2002) (quoting Quarles, 467 U.S. at 655-59)); State v. Nguyen, 779 So. 2d 279, 280-81 (Fla. 2d DCA 1998); see also People v. Attebury, 624 N.W.2d 912, 913, 917-18 (Mich. 2001) ("While the officers might have, in hindsight, mitigated the exigency by physically restraining defendant before he was allowed to dress, their failure to do so does not alter our analysis."). Although imminence may diminish over time, see Alexander, 810 So. 2d at 558, the public safety exception can still apply over an hour after an arrest or detention if a gun is missing. See United States v. Ferguson, 702 F.3d 89, 95 (2d Cir. 2012); Allen v. Roe, 305 F.3d 1046, 1051 (9th Cir. 2002) (citing United States v. Brady, 819 F.2d 884,

9

888 (9th Cir. 1987)); Commonwealth v. Dillon D., 863 N.E.2d 1287, 1289-90 (Mass. 2007); State v. Smith, 86 A.3d 524, 526, 529-30 (Conn. App. Ct. 2014).

Here, the trial court declined to apply the public safety exception, holding that the exigency that would have existed to justify the application of the exception when Officer Dula first responded had dissipated over time because law enforcement had secured the scene by the time Sgt. Heath questioned Maloney. Relying on the decision of the United States Court of Appeals for the Fourth Circuit in United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994), Maloney argues that this factual finding precludes the application of the public safety exception. We disagree.

Mobley is easily distinguished as no danger to public safety was present in that case. Mobley was encountered naked and unarmed at the door of his apartment. Id. at 690. By the time he was arrested and questioned, a security sweep of Mobley's apartment was already complete, indicating he was the only person present and that the apartment was his alone. Id. at 693. As the Fourth Circuit recognized, there was no explanation at any time as to what extraordinary circumstances prompted law enforcement to ask Mobley, after he had invoked his right to counsel, whether there were any weapons in the apartment. Id. Accordingly, the Fourth Circuit correctly concluded the public safety exception did not apply. Id.

Here, however, the sheer number of persons being detained constituted an extraordinary circumstance posing an imminent risk to law enforcement and the public. See Trice v. United States, 662 A.2d 891, 897 (D.C. 1995) (distinguishing Mobley because the presence additional persons at the scene was an extraordinary circumstance justifying the application of the public safety exception); see also Dillon D., 863 N.E.2d at

10

1289-90; Smith, 86 A.3d at 529-30. Indeed, there were still thirty to forty people being detained outdoors in a public, open area adjacent to the parking lot of the VFW when Sgt. Heath questioned Maloney. The trial court's analysis does not account for these facts or for the fact that the missing weapon could have been anywhere, including places where it might be accessible to Maloney, another detainee, a passerby, or even a child.

We find these distinctions significant, particularly because we are required to analyze the public safety exception "from the objective perspective of the presence of a public danger" and not in light of hindsight or the subjective motive of the law enforcement officer. See Mobley, 40 F.3d at 692 (citing Quarles, 467 U.S. at 655-56, 659); see also Smith, 86 A.3d at 529-30. Because the danger existing from a missing gun in a public space does not diminish with time, see Ferguson, 702 F.3d at 95-96; Allen, 305 F.3d at 1051; Borrell v. State, 733 So. 2d 1087, 1088-89 (Fla. 3d DCA 1999), we conclude that a residual danger to the law enforcement officers and the public existed at the time Sgt. Heath questioned Maloney about the empty holster.

The relevant facts in this case are virtually indistinguishable from Quarles. We therefore reverse the portion of the trial court's order suppressing evidence concerning Maloney's statements to Sgt. Heath and remand for further proceedings consistent with this opinion. See Borrell, 733 So. 2d at 1088-89.

REVERSED AND REMANDED.

TORPY and LAMBERT, JJ., concur.

11