******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DANTE SMITH
(AC 34529)

Lavine, Robinson and Peters, Js.*

*Argued November 21, 2013—officially released April 1, 2014*

(Appeal from Superior Court, judicial district of
Middlesex, Jongbloed, J.)

*Raymond L. Durelli*, assigned counsel, for the appel-
lant (defendant).

*Laurie N. Feldman*, special deputy assistant state's

attorney, with whom were *Russell Zentner*, senior assistant state's attorney, and, on the brief, *Peter A. McShane*, state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Dante Smith, appeals from the judgment of conviction, rendered after a jury trial, of two counts of assault in the second degree in violation of General Statutes § 53a-60 (a) (1). On appeal, the defendant claims that the court improperly denied his motion to suppress with respect to statements he made (1) at the crime scene and (2) later at the police station during his booking. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of March 9, 2010, the victim, Justin Molinaro, was driving his Audi A4 in the vicinity of Maplewood Terrace, a public housing complex in Middletown known to be a high crime area. As he drove past the complex, two unidentified men flagged him down and informed him that his cousin, the defendant, wanted to speak with him. The victim drove his car into a parking lot at Maplewood Terrace, where he saw the defendant get into the backseat of another car. The victim exited his Audi and asked the defendant what he wanted. While the victim was waiting for the defendant, he saw Tykeem Privott, who was also in the car with the defendant. The victim noticed that Privott had a supply of marijuana on his lap and began to chastise Privott for his drug use. As the victim talked to Privott, the defendant got out of the car wielding a Louisville Slugger aluminum baseball bat, which he used to strike the victim on the head. The blow knocked the victim to the ground, and the victim asked the defendant, "[W]hat the hell is going on?" The other occupants of the vehicle then exited the car and began to kick and punch the victim as he lay on the ground.

Privott picked up the Louisville Slugger and swung it at the victim, striking him on the back of his neck. The defendant choked the victim and told him to "go to sleep, motherfucker." The defendant ordered his accomplices to go through the victim's pockets, which they did, taking his cell phone, wallet, and the keys to the Audi.

As the assailants left, the victim stumbled to his feet. He found his car keys in a patch of grass near the parking lot. The defendant, however, reappeared and said, "What, you didn't have enough yet?" and pointed a black handgun in the victim's face. The defendant took the keys to the Audi and said, "This shit is mine." The victim then saw Privott, who was now also holding a handgun. Privott asked the defendant, "Do you want me to pop this motherfucker?" The defendant then turned and left in the Audi.

The victim walked to a nearby house and called 911. He reported to the dispatcher the details of the assault and carjacking. While on the telephone with the dispatcher, the victim saw the Audi double back, headed

in the direction of Maplewood Terrace. He told the dispatcher that six people were returning in his car with guns, and he asked the dispatcher to send help.

The police arrived on the scene, and police officers attended to the victim. One police officer later stated that the victim looked "like an alien" because the area around his left eye was bloodied, swollen, and disfigured. The swelling around the victim's eyes rendered him nearly blind. The victim was gasping for breath and making statements to the effect of, "I don't want to die." When asked what happened, the victim responded, "Dante Smith and Tykeem Privott did this. Dante had a bat and Tykeem had a gun." The victim faded in and out of consciousness and his respiration was irregular. Emergency workers arrived and transported him to the hospital.

After treating the victim, the police processed the crime scene and secured the area surrounding Maplewood Terrace, where a crowd had gathered. Approximately forty minutes after the assault took place, a black male calmly approached police Officers Dan Smith and Nicolas Puorro. As he drew near, he stated, "I am Dante Smith, my grandmother said the police were looking for me."

On the basis of the information provided by the victim, the police had reason to believe that the defendant was involved in an assault that involved both firearms and a baseball bat. The police informed the defendant that they had to place him in handcuffs for safety reasons, and that they had an obligation to protect both themselves and the surrounding crowd. The defendant stated that he understood, and that he also understood that he was not under arrest.

The police asked the defendant whether he had any weapons; he replied that he did not. The police frisked the defendant, but found no weapons. The defendant was asked whether he knew where the weapons were, to which he responded, "What weapons?" When asked about Privott, the defendant denied knowing him. The defendant was then asked what happened that evening. The defendant stated that he had been involved in a fight with the victim, and that he and the victim were cousins. He told the police that the victim had called him and wanted to go for a ride. The defendant stated that once he was in the car with the victim, the victim wanted to go and buy drugs. The defendant stated that he did not want to buy drugs and wanted to get out of the car. When the victim did not stop the vehicle, the defendant stated that he punched the victim in the face several times.

Upon hearing the defendant's narrative, the police informed him that it appeared as if the victim had been struck with a baseball bat, and that the injuries occurred to the left side of his face, which was inconsistent with

the defendant's story that the victim was driving. The defendant grew frantic and stopped cooperating with the police, stating, "Do what you got to do, arrest me, arrest me." The defendant was placed under arrest and transported to police headquarters.

The defendant was charged in a seven count amended information, which included two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The defendant thereafter filed a motion to suppress the statements he made to the police at the crime scene and during his booking at the police station, arguing that they were inadmissible pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). A hearing on the motion to suppress was held during which the defendant argued that the statements he made to the police while he was handcuffed at the crime scene should be suppressed because he was in police custody and interrogated without having received *Miranda* warnings. The court denied the motion, finding that the defendant was not in custody at the crime scene, and alternatively, that the public safety exception to *Miranda* applied. The court also found, with respect to the statements made at the police station during his booking, that the defendant was properly advised of his *Miranda* rights and that he waived his rights when, during his booking, he repeated the statement he made to the police at the crime scene.

Following a trial, the jury found the defendant guilty of two counts of the lesser included offense of assault in the second degree in violation of § 53a-60 (a) (1), and rejected the defendant's claim of self-defense. The defendant was found not guilty of all other charges. The court merged the two assault convictions and sentenced the defendant to a total effective term of five years incarceration, execution suspended after forty months, followed by five years probation with special conditions. This appeal followed.

On appeal, the defendant claims that the admission of his statements to the police violated his fifth amendment rights and reasserts a claim he made at trial that he was subjected to custodial interrogation without *Miranda* warnings at the crime scene. The defendant also claims that the statements he made at the police station during his booking were inadmissible under the doctrine established in *Missouri* v. *Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). We affirm the judgment of the trial court.

I

We begin by analyzing the defendant's claim that the trial court erred when it denied his motion to suppress the incriminating statements that he made at the crime scene.

"Our standard of review of a trial court's findings and

conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [trial court's] decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

The defendant argues that he was in custody as soon as the police handcuffed him, and, therefore, he was entitled to *Miranda* warnings when he was questioned. The state, on the other hand, argues that the defendant was not in custody, and, alternatively, that the public safety exception to *Miranda* applies. Because we agree with the state that the public safety exception applies to the facts of this case, we do not need to decide whether the defendant was in custody for the purposes of *Miranda*.

As our Supreme Court has noted, "The United States Supreme Court first articulated the public safety doctrine in *New York* v. *Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). In *Quarles*, a young woman approached two police officers in their patrol car and informed them that a man armed with a gun had just raped her. Id., 651. She described her assailant and told the officers that the man had just entered a nearby supermarket. Id., 651–52. The officers entered the supermarket, located a man, Benjamin Quarles, who matched the description given, and apprehended him after a brief pursuit through the store. Id., 652. One officer frisked Quarles and detected an empty shoulder holster before handcuffing him. Id. Before reading him his *Miranda* rights, the officer asked Quarles where the gun was, and Quarles responded, 'the gun is over there.' Id. Quarles subsequently was charged with criminal possession of a weapon. Id. The trial court granted, and the New York Court of Appeals affirmed, Quarles' motion to suppress both the gun and the statement because the officer had not given him his *Miranda* warnings. Id., 652–53.

"The United States Supreme Court, however, reversed the New York Court of Appeals' decision. Id., 660. It held that both the statement and the gun were admissible under the public safety exception because the 'concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*.' Id., 653. The court reasoned that 'the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.' Id., 657. Furthermore, the court explained that the exception 'simply [frees officers] to follow their legitimate

instincts when confronting situations presenting a danger to the public safety.' Id., 659. The court 'decline[d] to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.' Id., 657–58. The court explained that questions must 'relate to an objectively reasonable need to protect the police or the public from any immediate danger . . . .' Id., 659 n.8" *State* v. *Betances*, 265 Conn. 493, 502–503, 828 A.2d 1248 (2003).

*Quarles* instructs that rigid adherence to the prophylactic rule enunciated in *Miranda* must be balanced against the need for immediate information in a developing situation that may pose a threat to public safety. In the present case, in the wake of a violent assault, there was a need for information related to the location of weapons and the whereabouts of the potentially armed coassailants. We note that the defendant was asked a few pointed questions specifically related to the public safety concerns of the police.[1] Aside from the fact that the defendant was handcuffed, there were no coercive or intimidating actions undertaken by the police. In fact, the defendant voluntarily approached the police and initiated a conversation with them near the crime scene. He appeared to be calm, not under the influence of drugs, and ready to tell his narrative. The record reveals that the conversation the police had with the defendant was initially relaxed, and that he consented to and understood why he was being handcuffed. The questioning also took place in public, by two police officers who did not display their weapons. This initial interaction between the police and the defendant lasted for less than two minutes.[2]

Given the brutal nature of the assault on the victim and the report that a baseball bat and firearms were used, the police had a legitimate concern that there were both unsecured weapons and as many as five armed assailants in the vicinity of Maplewood Terrace. As in *Quarles*, the police had information that the defendant had been armed, and therefore reasonably feared that a gun could be in the vicinity. Furthermore, what posed a particularly acute threat to public safety was the large number of bystanders who had emerged from their residences and gathered at the crime scene.

The defendant argues that as soon as the police frisked him and found no weapons, any public safety concerns were dispelled. We decline to take such a view, which is based on 20/20 hindsight and information not then known to the police. As the Supreme Court

noted in *Quarles*, "[i]n a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing . . . ." *New York* v. *Quarles*, supra, 467 U.S. 656.

We therefore conclude, as the United States Supreme Court did in *Quarles*, that the danger to innocent bystanders, the investigating officers, and the defendant himself constituted an objective threat to public safety. See *State* v. *Betances*, supra, 265 Conn. 504 ("the public safety exception applies to individual members of the public, including defendants, as well as to the public at large" because "[w]hen a life is in danger, the law should make no distinctions"). Accordingly, on the basis of our review of the record, we conclude that the court properly determined that the public safety exception to *Miranda* was applicable to the facts of this case when it denied the defendant's motion to suppress.

## II

The defendant's second claim is that, notwithstanding the fact that the police read him his rights prior to his making incriminating statements during the police booking procedure, those statements are inadmissible under the doctrine established in *Missouri* v. *Seibert*, supra, 542 U.S. 600. That doctrine stands for the narrow proposition that, when the police deliberately violate *Miranda* in the first instance, and then obtain the same confession with proper *Miranda* warnings at a later time, the defendant's confession is tainted and inadmissible. See id., 613–14. Because we conclude that the statements the defendant made at the crime scene were admissible under the public safety exception to *Miranda*, the doctrine enunciated in *Seibert* is inapplicable.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of the judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant argues that the question "what happened here?" was outside of the public safety exception because the question invited a response that was broader than the specific concern for public safety. We disagree. The overall nature and context of the questions the police asked the defendant pertained to the safety and well-being of the public. At the suppression hearing Officer Smith testified: "So, I basically started asking [the defendant] are there any weapons that we should be aware of, is there anything around on the complex. We felt that something may have been discarded, somebody, a civilian could have come into possession of a gun or weapon. He said no, there's no weapons. I started asking him what happened, if he knew anything, if he was involved in this assault because this is what the victim had said and he said that he had been involved in an assault with [the victim], but he had not used any weapons."

In our view, the focus of the questioning was still related to the location of the weapons. We agree wholeheartedly with the United States Court of Appeals for the Second Circuit that "a question need not be posed as narrowly as possible, because '[p]recision crafting cannot be expected' in the circumstances of a tense and dangerous arrest. . . . Thus, a question that

plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." (Citation omitted.) *United States* v. *Estrada*, 430 F.3d 606, 612 (2d Cir. 2005).

[2] The trial court found that "[the defendant] immediately took responsibility for the assault on the [victim], admitting that he punched him in the face several times." The defendant claims that this finding was clearly erroneous as it implies that the defendant made the statements at issue spontaneously and not in response to police inquiries. Although it is true that the defendant did not spontaneously launch into his account and that his responses followed police inquiry, the trial court's finding does not impact our public safety exception analysis, which allows for limited questioning.

_____