******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JACK
SEVERO BARDALES
(AC 36371)

DiPentima, C. J., and Mullins and Bear, Js.

*Argued December 1, 2015—officially released April 19, 2016*

(Appeal from Superior Court, judicial district of New
Britain, Alander, J.)

*David K. Jaffe*, with whom, on the brief, was *Cody
N. Guarnieri*, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney,
with whom, on the brief, were *Brian Preleski*, state's
attorney, and *Brett J. Salafia*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Jack Severo Bardales, appeals from the judgments of conviction, rendered after a jury trial on three consolidated dockets, of three counts of possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b); two counts of possession of marijuana with intent to sell in violation of § 21a-278 (b); one count of possession of narcotics in violation of General Statutes § 21a-279 (a); and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant claims on appeal that the trial court (1) erred by denying his motion to suppress his statement, which he alleges was obtained in violation of his constitutional rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the cocaine retrieved from his car, which he alleges is fruit of the poisonous tree; (2) abused its discretion by admitting evidence of the defendant's prior uncharged misconduct; and (3) erred by denying his motion to suppress evidence seized during a search of the defendant's residence at 90 Pinebrook Terrace in Bristol (Bristol residence) that he alleges violated his constitutional rights under the fourth and fourteenth amendments. We affirm the judgments of the trial court.

The following facts were found by the court in its memorandum of decision on the defendant's motion to suppress. After investigating the defendant's narcotics distribution activities, the Statewide Narcotics Task Force (task force), which is a coalition of state and local police officers assigned to investigate violations of state narcotics laws, took a statement from a credible confidential informant who told a task force member that the defendant used a stash house other than his own residence to store illegal firearms for sale. The same informant also told the task force that he had observed three firearms in the defendant's possession at the defendant's New Britain residence. Relying on these statements, the task force obtained two warrants on March 29, 2011. The first warrant authorized the police to conduct a search of the defendant's residence at 233 Country Club Road in New Britain (New Britain residence). The second warrant authorized the police to search the defendant's person.

The police executed these warrants on April 5, 2011. At approximately 3 p.m., officers searched the New Britain residence. On arrival, they discovered William Cote living at the residence and immediately detained him. He sat in the house under guard while it was searched, and after the search, he was arrested because he admitted to possessing cocaine located among his personal effects. Cote remained in police custody throughout the New Britain search and until the early morning hours of the following day. During the New Britain search, the police seized a pistol, ammunition,

$25,000 in cash, five ounces of cocaine, and various drug processing and packaging materials.

After the completion of the New Britain search, at approximately 8 p.m., on April 5, 2011, the police observed the defendant leaving his Bristol residence in his car. They stopped him to execute the search warrant for his person. The defendant exited his car when instructed to do so by the police. Sergeant Thomas Bennett, a task force supervisor, approached the defendant and explained that he had a warrant to search the defendant's person. Bennett then asked the defendant whether there was anything in the car that he needed to be concerned about. The defendant answered that there was cocaine in the pocket of the car door. Bennett discovered cocaine in this location. The police arrested the defendant. It was the defendant's statement and the evidence to which it led that gave rise to the defendant's conviction of one count of possession of narcotics.

After the police finished searching the New Britain residence, they prepared an application for a warrant to search the Bristol residence because Cote, who was in their custody following his arrest during the New Britain search, informed the police that he had seen a gun and cocaine in the defendant's possession at the Bristol residence. This information both motivated and provided the basis for the search warrant, and, despite Cote's statement that he had been inside the Bristol residence, the only information about that premises that was included in the warrant application was a description of its exterior.

After the police searched the defendant and his car, they entered the Bristol residence and looked into each room and closet to ensure that there was no one present who might destroy evidence before the search warrant could be signed and delivered to them. Finding no one inside, the police remained in the Bristol residence while they waited for the search warrant to arrive.

The police, however, did not limit their pre-warrant search activities to looking into rooms and closets. Before the search warrant was obtained and executed, the police conducted an additional search of the entire Bristol residence to locate and photograph contraband. The first time stamp on a photograph taken from inside the Bristol residence indicates that the photograph was taken at 8:41 p.m. Ciarra Ennis, a social worker from the Department of Children and Families (department), testified that she received a call at 9:12 p.m. indicating that the defendant's home had been searched and that narcotics had been found. Although the police photographed items inside the residence before the search warrant arrived, they did not seize or remove anything from the residence until after they received the signed warrant.

The defendant ultimately was charged in a long form

information with three counts of possession with intent to sell narcotics in violation of § 21a-278 (b); two counts of possession of marijuana with intent to sell in violation of § 21a-278 (b); one count of possession of narcotics in violation of § 21a-279 (a); and one count of criminal possession of a firearm in violation of § 53a-217 (a) (1). The defendant was found guilty by the jury of each count of the long form information and was sentenced by the court to a total of nineteen years incarceration, execution suspended after twelve years, with five years of probation. This appeal followed.

I

The defendant first claims that the trial court erred in denying his motion to suppress his statement, made in response to Bennett's question that was asked prior to the defendant receiving *Miranda* warnings, and in not suppressing the cocaine that was discovered in his automobile as a result of his response to the question. The defendant argues that the court improperly applied the public safety exception[1] to questions asked of him in violation of the requirement, articulated in *Miranda* v. *Arizona*, supra, 384 U.S. 444, that in order for statements made in response to custodial interrogation to be admissible in a prosecution against the person who made them, the prosecutor must demonstrate the use of procedural safeguards sufficient to secure the privilege against self-incrimination. We disagree.

The following additional procedural history is relevant. The defendant moved to suppress his answer to Bennett's question to him and the cocaine that the police discovered in his car as a result of that answer.[2] In his memorandum in support of his amended motion to suppress, the defendant argued, inter alia, that his answer to Bennett's question was made during a custodial interrogation without him previously being warned about, and waiving, his rights under *Miranda*, and that his statement and the evidence discovered as a result should be suppressed.

The court, on July 1 and 2, 2013, held a hearing on the defendant's motion to suppress. During the hearing, Bennett testified about the circumstances surrounding the search of the defendant's person. In particular, Bennett testified about the timing of the *Miranda* warnings he gave the defendant and about the actual content of the question he asked that led to the discovery of cocaine. On direct examination by the prosecutor, Bennett testified that he gave the defendant *Miranda* warnings "[a]fter explaining the search warrant to him." Bennett then testified that after advising the defendant of his *Miranda* rights, he asked him whether "there was anything in the truck that we need to be concerned about." Bennett testified that the defendant responded that there was a small quantity of cocaine in the driver's side door pocket.

During cross-examination by defense counsel, however, Bennett equivocated both about the timing of and the content of his question to the defendant. Bennett testified that he gave the defendant *Miranda* warnings "at some point," and then, in response to questioning by the court, Bennett further conceded that he was "not sure of the exact timing of it. It could have been afterwards." Bennett also responded "[y]es, sir," when defense counsel asked, "[a]nd then you asked him if he had any contraband, correct," and later testified that he "asked [the defendant] if there was anything in the car." When pressed by defense counsel as to whether the question was "designed to elicit perhaps an incriminating response," Bennett answered, "[a]nd also officer safety. If there's a gun in the vehicle that we should know about it. Yes, sir."

The court found that the state had not met its burden of proving that the police had advised the defendant of his *Miranda* rights before asking him the question at issue here. The court also found, however, that the question Bennett had asked had been "whether there was anything in the vehicle that he needed to be concerned about." The court reasoned that in the context at issue, in which the police knew that they were confronting an individual who had been accused of possessing and trafficking in firearms, the "primary thrust" of Bennett's question, however facially imprecise it may have been, "was to inquire as to the presence of any firearms." The court concluded that the public safety exception to the requirement of prior *Miranda* warnings, therefore was applicable. The court further concluded that the fact that the question was broad enough to elicit other information, and in fact did so, did not alter the "primary nature" of the question as a public safety inquiry, and thus did not undermine the exception's application.

On appeal, the defendant argues that the trial court erred in finding that the question Bennett asked was "whether there was anything in the vehicle that he needed to be concerned about," and also in concluding that the public safety exception applied under the circumstances. In response, the state argues that the exception was applied properly, that there was factual support in the record for the court's finding as to the content of Bennett's question, and that any error was harmless beyond a reasonable doubt. We conclude that the court's finding was not clearly erroneous, and we further conclude that the court did not err in applying the public safety exception.

We begin with the relevant standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal con-

clusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [trial court's] decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* v. *Arizona*, supra, 384 U.S. 444. These procedural safeguards are the advisement of *Miranda* rights and the waiver thereof by the defendant. Id., 444–45. "When a suspect is taken into custody, the *Miranda* warnings must be given before any interrogation takes place. . . . The primary purpose of the *Miranda* warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Citations omitted; internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 500, 828 A.2d 1248 (2003).

However, "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*." *New York* v. *Quarles*, 467 U.S. 649, 653, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). The purpose of the public safety exception is to "free [police officers] to follow their legitimate instincts when confronting situations presenting a danger to the public safety." Id., 659. To fall within the public safety exception to *Miranda*, a question must be "reasonably prompted by a concern for the public safety." Id., 656. Where the public safety exception applies, a defendant's statement, and the physical evidence recovered as a result of that statement, may be admitted into evidence at trial. See id., 657–60 and n.9.

As the use of the word "reasonably" in the foregoing test suggests, "the availability of [the public safety] exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting [the arresting officers in *Quarles*], where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception . . . should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in [the arresting officer's] position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evi-

dence from the suspect." (Emphasis omitted; footnote omitted.) Id., 656. The volatility and urgency of emergency situations are such that "a question need not be posed as narrowly as possible, because [p]recision crafting cannot be expected in the circumstances of a tense and dangerous arrest. . . . Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." (Citation omitted; internal quotation marks omitted.) *United States* v. *Estrada*, 430 F.3d 606, 612 (2d Cir. 2005), cert. denied sub nom. *DeJesus* v. *United States*, 547 U.S. 1048, 126 S. Ct. 1637, 164 L. Ed. 2d 348 (2006).

As a preliminary matter, we conclude that the court's factual finding that the question Bennett asked the defendant was "whether there was anything in the vehicle that he needed to be concerned about" was not clearly erroneous in view of the evidence and pleadings in the whole record. See *State* v. *Smith*, 149 Conn. App. 149, 155, 86 A.3d 524, cert. granted on other grounds, 311 Conn. 954, 97 A.3d 984 (2014). "A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Sherrod*, 157 Conn. App. 376, 382, 115 A.3d 1167, cert. denied, 318 Conn. 904, 122 A.3d 633 (2015).

Although the defendant correctly points out that Bennett's testimony was not entirely consistent with regard to whether his question was that found by the court or whether instead it was whether the defendant had "any contraband," there is evidence in the record to support the court's finding because Bennett testified at least twice during the suppression hearing that he asked the question found by the court, or a very close approximation of it. During his cross-examination, however, Bennett admitted to having asked the defendant whether he had "any contraband."[3] To the extent that Bennett's testimony was internally inconsistent, the court had to resolve the inconsistency to make a factual finding. The court's finding did not lack support in the record, nor are we left with the definite and firm conviction that a mistake was committed. The court's finding about the content of Bennett's question, therefore, was not clearly erroneous.[4]

We further conclude that the court's determination that the public safety exception applied was legally and logically correct and finds support in the facts as set forth in the court's memorandum of decision denying the defendant's motion to suppress. See *State* v. *Smith*, supra, 149 Conn. App. 155.

The United States Court of Appeals for the Second

Circuit, as well as Connecticut courts, have applied the public safety exception under circumstances similar to those present in this case. In each case, the reviewing court was careful to note the specific facts that gave rise to a reasonable public safety concern.

In *United States* v. *Reyes*, 353 F.3d 148, 153–54 (2d Cir. 2003), the police were arresting a known narcotics dealer following a drug transaction in a public place, and a confidential informant had told them that the defendant routinely carried a firearm while conducting business. The police officers had not yet handcuffed the defendant when they asked him whether he had anything on his person that could harm them, and the defendant responded that there were drugs in the car. Id., 154. The court in *Reyes* considered the officers' professed "knowledge and experience as [police officers] in concluding that [the defendant] could be carrying sharp objects or firearms." Id. In sum, concluded the court, the officers' question to the defendant was "reasonably prompted by a concern for officer safety" and thus fell within the public safety exception. (Internal quotation marks omitted.) Id., 155.

In *United States* v. *Newton*, 369 F.3d 659, 678 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004), the police arrived at the apartment of the defendant's mother after she called and informed them that the defendant possessed a firearm in their home and told them where it was. She also said that the defendant had threatened to kill her and her husband. Id. When the police arrived the following day, she, her husband, and the defendant were present in the apartment. Id. The court emphasized that the presence of other individuals, as well as the possibility that the gun, the existence of which was known to the police, had been moved from its previous location and was present, posed a safety risk to all of the persons in the apartment. Id. Accordingly, the court concluded that the police officer's question about whether the defendant had any contraband fell within the public safety exception.[5] Id., 679.

In *United States* v. *Estrada*, supra, 430 F.3d 612–13, the court applied the public safety exception to an officer's question about whether there were any guns in the defendant's apartment. In explaining why the exception applied, the court noted that the defendant had a history of violent felony convictions, from which the officers reasonably could have inferred that he was capable of violence; that another person was present in the apartment, increasing the potential threat to police officers making the arrest; and finally, that the officers had information from a confidential informant that the defendant was storing drugs in the apartment as part of a major narcotics trafficking operation, from which they reasonably also could have inferred that he could have possessed a weapon on the premises. Id., 613. "We

have often recognized that firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers." Id.

In *State* v. *Smith*, supra, 149 Conn. App. 152, the police were called to the scene of a brutal assault by means of a baseball bat, and they were warned that the perpetrator was armed with a firearm. They handcuffed the defendant shortly after arriving. Id., 153. A large crowd gathered. Id., 158. Without giving the defendant a *Miranda* warning, the police asked him whether he had any weapons. Id. He answered that he did not, and the police frisked him and found none. Id. The police then asked him whether he knew where the weapons were, and he answered, "[w]hat weapons?" Id. The police also asked the defendant what had happened that evening, and the defendant responded with a narrative inconsistent with the victim's. Id. This court reasoned that the brutality of the assault, the possibility of multiple assailants, the large crowd that had gathered near the scene, and the reports of as yet unsecured weapons posed "an objective threat to public safety" to which all of the officers' questions were directed properly. Id., 159.

Similarly, in the present case, there was a factual predicate for the court to find that when Bennett asked the defendant whether there was anything in the car that the officers needed to be concerned about, his question was reasonably prompted by a concern for the officers' safety. See *New York* v. *Quarles*, supra, 467 U.S. 656. Like the officers in *United States* v. *Estrada*, supra, 430 F.3d 613, the officers here reasonably could have been wary of the persistent connection between drug operations and weapons. Pursuant to the rationale for the public safety exception, Bennett was free to draw upon his knowledge and experience as an officer to conclude that under the circumstances, the defendant might be carrying a weapon in his vehicle that needed to be secured. Cf. *United States* v. *Reyes*, supra, 353 F.3d 154.

Furthermore, the police had specific information from a consistently reliable confidential informant that the defendant possessed at least three firearms and that he routinely moved these weapons to avoid their detection, as his status as a convicted felon made it illegal for him to possess them. The police had used this information to procure a warrant to search the New Britain residence, and on executing that warrant, they discovered a pistol and ammunition. This discovery simultaneously corroborated the informant's reported observations and reasonably alerted the police to the possibility that the defendant possessed, and perhaps was transporting with him in his vehicle, at least two more firearms.

Finally, as in *Estrada, Newton,* and *Smith,* other individuals were present at the scene of the search of the

defendant's person, and Bennett reasonably could have deemed his and their safety to be at risk. Cf. *United States* v. *Estrada*, supra, 430 F.3d 613; *United States* v. *Newton*, supra, 369 F.3d 678; *State* v. *Smith*, supra, 149 Conn. App. 159.

The defendant's attempts to distinguish his own case from *Reyes* and *Smith* are unavailing. The defendant argues that his case is distinguishable from *Reyes* because he "was not engaged in any apparent criminal conduct when seized by police officers." The defendant's premise is flawed; by the time the defendant was stopped, officers already had searched the New Britain residence and retrieved a wealth of incriminating evidence, including drugs, drug preparation materials, a firearm, and ammunition. All of these items implicated the defendant in ongoing narcotics sales and illegal possession of firearms. Simply because, unlike the defendant in *Reyes*, the defendant here was not arrested as he personally was preparing to complete a narcotics transaction does not mean that he was not engaged in illegal activities when stopped. See *United States* v. *Reyes*, supra, 353 F.3d 150. Rather, the police had evidence that the defendant was conducting a significant drug sale operation. At the time they stopped and searched him, it was reasonable for them to consider the commonplace connection between drug sales and firearms, the informant's observations of the defendant possessing and trafficking in weapons, and their own discovery of a pistol at the New Britain residence, and to ask a question targeting the associated risks.

Similarly, we are not persuaded by the defendant's effort to distinguish his case from *State* v. *Smith*, supra, 149 Conn. App. 149. The defendant points out that unlike in that case, the stop and search of his person did not follow upon a violent incident, and there also was no evidence of other individuals at or near the scene where the defendant was searched. Cf. id., 159. The defendant's argument misconstrues the situation here and the potential risks that confronted the police. Although no evidence was presented at the suppression hearing of persons who could have accessed weapons in the defendant's vehicle, at the time of the search, the police could not have been similarly certain of their absence given their lack of knowledge of the scope of the defendant's operation, including their discovery of the previously unknown Cote. It was not unreasonable, therefore, for them to guard against the risk of actions by other persons.

Furthermore, the seeming absence of persons involved with the defendant did not mitigate the inherent dangers posed by weapons or other dangerous items to the police who were present during the execution of the warrant for the search of the defendant's person. Cf. *United States* v. *Williams*, 181 F.3d 945, 954 (8th Cir. 1999) ("[s]imilarly, the officers could not have known

whether other hazardous weapons were present . . . that could cause them harm if they happened upon them unexpectedly or mishandled them in some way" [footnote omitted]). The court's conclusion that Bennett's question fell within the public safety exception to the requirements of *Miranda* was legally and logically supported by the evidence before the court in connection with the motion to suppress. The court, therefore, did not err in denying the defendant's motion to suppress the defendant's response to Bennett's question and the cocaine discovered as a result thereof.[6]

## II

The defendant's second claim is that the court abused its discretion by admitting uncharged misconduct evidence, namely, Cote's testimony that the defendant possessed and moved large amounts of narcotics in the basement of the New Britain residence, as well as Cote's testimony that the defendant compensated him in cocaine for his services as a handyman. We disagree.

The following additional facts and procedural history are relevant to this claim. Before trial, the defendant filed a motion in limine to exclude uncharged misconduct evidence. At trial, outside the presence of the jury, the prosecutor made an offer of proof whereby Cote would distinguish his own living space from that of the defendant and Janna Forsythe, the defendant's girlfriend, and would describe ongoing activities in the New Britain residence at the time that the search warrant was executed. The court allowed the prosecutor to make this inquiry on voir dire, and Cote testified that he ventured downstairs to the basement of the New Britain residence, where he observed the defendant, Forsythe, and others with large amounts of marijuana and cocaine. He explained that he had observed this basement activity on approximately ten or twelve occasions.

The court then ruled that this testimony was admissible under § 4-5 of the Connecticut Code of Evidence. In articulating its ruling, the court explained that the evidence was admissible to show a common plan or scheme, and also the defendant's knowledge that narcotics were present in the New Britain residence. The court asked the prosecutor whether he was planning to offer testimony from Cote that the defendant paid him in cocaine for his services as a handyman. The prosecutor answered that the evidence was probative of the defendant's access to the quantity required for payment, and by extension, of his knowledge and sources of it. After confirming with the prosecutor that he planned to provide evidence of drugs discovered during the search of the basement of the New Britain residence, the court clarified both of its rulings. The court explained that Cote's testimony regarding his observations of the defendant and large quantities of drugs was admissible both to prove the defendant's

knowledge that they were there and his dominion and control of them. The court further explained that Cote's testimony that the defendant had compensated him in cocaine for his services was admissible "for the reasons stated" and also to complete the story of the crime and to put it in the context of contemporaneous events. The court found that the probative value of all of the disputed evidence outweighed any prejudicial effect it might have.

Before the jury, Cote testified consistently with the offer of proof, adding further that he was a cocaine addict himself. The trial court also gave a limiting instruction to the jury with respect to all the uncharged misconduct evidence.

"The standard of review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Franko*, 142 Conn. App. 451, 459, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . [Our Supreme Court has] developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (b) [now (c)] of the Connecticut Code of Evidence]. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 459–60.

Section 4-5 (c) of the Connecticut Code of Evidence refers to three relevant exceptions to the general rule

against admitting evidence of prior misconduct to prove that a criminal defendant is guilty of the crime of which he is accused, all of which find support in our cases. "Evidence of other crimes, wrongs or acts of a person is admissible . . . to prove . . . common plan or scheme . . . knowledge . . . or an element of the crime . . . ." Conn. Code Evid. § 4-5 (c); see *State* v. *Randolph*, 284 Conn. 328, 342, 933 A.2d 1158 (2007) (common plan or scheme); *State* v. *Fredericks*, 149 Conn. 121, 124, 176 A.2d 581 (1961) (knowledge). A fourth relevant exception to the general rule against prior misconduct evidence, not listed in § 4-5, is that such evidence is admissible to complete the story of the charged crime. *State* v. *Jenkins*, 24 Conn. App. 330, 336, 588 A.2d 648, cert. denied, 219 Conn. 903, 593 A.2d 132 (1991).[7]

"Evidence of uncharged misconduct, although inadmissible to prove a defendant's bad character or propensity to engage in criminal behavior, is admissible [t]o prove the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part. . . . To prove the existence of a common scheme or plan, each crime must be an integral part of an overarching plan explicitly conceived and executed by the defendant or his confederates. . . . Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 342. "In . . . true common scheme or plan cases, the nature of the uncharged misconduct and the charged crime, or the existence of connecting evidence, reveal a genuine connection between the crimes in the defendant's mind." (Internal quotation marks omitted.) Id., 343.

"[E]vidence of other offenses may be relevant to prove guilty knowledge, but the evidence must be so related in time, place and circumstance to the offense charged as to have substantial probative value in the determination of guilt. . . . The determinative question is whether the circumstances in the particular case form a basis for a sound inference as to the guilty knowledge of the accused in the transaction under inquiry." (Citations omitted.) *State* v. *Fredericks*, supra, 149 Conn. 124–25.

"Furthermore, evidence of uncharged misconduct may come into evidence to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 24 Conn. App. 336.

A

The first proffered section of testimony, which con-

sisted of Cote's description of his observation, on several occasions, of the defendant and others in the basement of the New Britain residence with large quantities of drugs, was admitted as evidence of the defendant's common plan or scheme to possess narcotics with the intent to sell them, of his knowledge that drugs were present in the New Britain residence, and of his dominion and control over the drugs alleged in the information. The court did not abuse its discretion by admitting this testimony for any of the purposes stated in its ruling.

Cote's testimony about seeing the defendant with large amounts of drugs was admissible to prove the defendant's common scheme or plan to possess narcotics with the intent to sell them. Cote's observations were relevant to prove that the defendant had concocted and was engaged in such a common scheme because their repeated nature, and the significant quantities of narcotics involved, tended to make it more probable that the defendant did not possess the drugs for which he was charged merely as a casual user, but rather as a part of an ongoing, profit driven sales operation. The acts described in Cote's testimony, combined with the charged offenses, therefore comprise "integral part[s] of an overarching plan explicitly conceived and executed by the defendant." (Internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 342.

This testimony also was admissible to prove the defendant's knowledge that the narcotics he was charged with possessing were present in the New Britain residence. Cote's testimony was relevant for this purpose because that testimony placed the defendant in regular proximity to narcotics in the same locations as those he was charged with possessing, over a period of months preceding the execution of the warrant. This association tended to make it more probable that the defendant was similarly aware of the seized narcotics, and formed a basis for a sound inference as to the guilty knowledge of the accused in the offense under inquiry. See *State* v. *Fredericks*, supra, 149 Conn. 124–25. Such knowledge, in turn, tended to make it more probable that the defendant intended to possess the drugs with the intent to sell them. See General Statutes § 21a-278 (b) (listing "intent to sell or dispense" as element required for conviction); *State* v. *Sanchez*, 75 Conn. App. 223, 243–44, 815 A.2d 242 (quantity of narcotics discovered in defendant's possession is probative of intent to sell), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003).

Finally, Cote's testimony about seeing the defendant with drugs in the New Britain residence tended to make it more probable that the drugs were under the defendant's dominion and control. Dominion and control establishes possession, an element of the charged offenses of possession with intent to sell. See General

Statutes § 21a-278 (b) (listing possession as element required for conviction); *State* v. *Mangual*, 311 Conn. 182, 215, 85 A.3d 627 (2014) (explaining how dominion and control can establish constructive possession). Because Cote's testimony tended to make it more probable that the drugs discovered at the New Britain residence during the search were under the defendant's dominion and control, it also made it more probable that he possessed them within the meaning of the relevant statutes.

Cote's testimony about seeing the defendant with drugs, therefore, was "relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (b) [now (c)] of the Connecticut Code of Evidence]"; (internal quotation marks omitted) *State* v. *Franko*, supra, 142 Conn. App. 460; indeed, it was relevant to all of the exceptions for which it was offered. Furthermore, the court did not abuse its discretion by finding that the probative value of the testimony outweighed the risk of undue prejudice. As explained previously in this opinion, the evidence was admissible under several exceptions to the rule against prior misconduct evidence as substantive evidence of guilt. The evidence established that the defendant not only was aware of significant quantities of narcotics on his property on a regular basis, but also that he, in fact, intended to possess them and sell them. This evidence of intent with respect to the narcotics described in Cote's testimony is probative also of the defendant's intent with respect to the narcotics seized from the Bristol residence. Additionally, to prevent any risk that the jury could have used the evidence for an impermissible purpose, such as drawing a propensity inference,[8] the court gave the jury a limiting instruction with regard to the uncharged misconduct evidence. Without a contrary indication, we presume that the jury followed that instruction. See *Stratek Plastic Ltd.* v. *Ibar*, 145 Conn. App. 414, 419, 74 A.3d 577, cert. denied, 310 Conn. 937, 79 A.3d 890 (2013). "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Franko*, supra, 142 Conn. App. 460. We cannot discern any abuse of discretion in the trial court's finding that the probative value of the evidence in the form of Cote's testimony about the defendant's activities in the New Britain residence outweighed the risk of undue prejudice to the defendant resulting from such evidence.

We conclude, therefore, that the court did not abuse its discretion in admitting Cote's testimony relating to his observations of the defendant in the basement of the New Britain residence on ten to twelve occasions with large quantities of narcotics.

B

The second proffered section of testimony, in which Cote disclosed that the defendant had paid him with cocaine in exchange for Cote's services as a handyman, was admitted to prove the defendant's common plan or scheme to possess narcotics with the intent to sell them, his knowledge that such narcotics were present in the New Britain residence, his dominion and control of them, and to complete the story of the crime by placing it in the context of contemporaneous events. The court did not abuse its discretion by admitting the testimony for any of these purposes.

The court reasonably concluded that Cote's testimony was admissible to prove the defendant's common plan or scheme to possess narcotics with the intent to sell them. Cote's testimony provided evidence that the defendant was engaged in a continuing drug sales operation in the New Britain residence. Cote's testimony also described actual narcotics transactions between the defendant and Cote. These facts in turn made it more probable that there was a genuine connection between the crimes in the defendant's mind; see *State* v. *Randolph*, supra, 284 Conn. 343; that is, the defendant's acts of compensating Cote in cocaine were the defendant's method of ensuring the maintenance and upkeep of the New Britain residence, which he used to store and prepare narcotics for his illegal business.

The court also reasonably concluded that Cote's testimony was admissible to prove the defendant's knowledge that narcotics were present in his New Britain residence. In previous opinions, we have allowed testimony of uncharged, prior drug transactions to be admitted under exceptions to the general rule prohibiting other misconduct evidence, including proof of a defendant's relevant knowledge. For example, in *State* v. *Webster*, 127 Conn. App. 264, 285, 13 A.3d 696 (2011), rev'd on other grounds, 308 Conn. 43, 60 A.3d 259 (2013), the prosecution elicited the testimony of a witness that the defendant had sold her cocaine on occasions preceding the one that precipitated the charged offenses. In *Webster*, this court concluded that "[i]t belies logic and a rational view of the evidence to suggest that the existence of a drug-selling agreement between the defendant and [the witness] did not tend to explain what had occurred; the evidence tended to make it more likely that the defendant had knowledge of the cocaine in his possession and that he intended to sell it to [the witness] in the manner alleged by the state." Id. Similarly, in *State* v. *Orellana*, 89 Conn. App. 71, 87, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005), this court concluded that evidence of past drug sales to a witness was relevant to prove that the defendant knew that there was heroin in his automobile and that he intended to sell it to the witness. Likewise, in the present case, the defendant's bartering of cocaine in exchange for Cote's handyman services was relevant

to show that the defendant was aware of the narcotics stored and used in the New Britain residence, which knowledge in turn made it more probable that he intended to possess them with the intent to distribute and sell them.

Cote's testimony also was admissible to demonstrate the defendant's dominion and control of the narcotics seized from the New Britain residence during the April 5, 2011 search. The defendant was convicted of possession with intent to sell narcotics and of possession with intent to sell marijuana in connection with the contraband seized from the New Britain residence. See General Statutes § 21a-278 (b). "[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . [When] . . . the [narcotics are] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . [When] the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 215. The state was required to prove such circumstances in this case because the defendant was not in exclusive possession of the New Britain residence; as the police discovered on arrival, Cote also was living there. Cote's testimony that the defendant had given him cocaine in exchange for his services was therefore relevant to prove the defendant's dominion and control of the charged substances because it evoked circumstances tending to buttress an inference that the defendant exercised dominion and control over them. See id. Cote testified that the defendant physically possessed a narcotic, cocaine, in the New Britain residence on the occasions when he paid cocaine to Cote. Cote's testimony tended to make it more probable that, notwithstanding the fact that Cote occupied a portion of the New Britain residence, the drugs seized pursuant to the warrant belonged to the defendant.

Finally, the testimony was admissible to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. See *State* v. *Jenkins*, supra, 24 Conn. App. 336. The evidence that the defendant bartered the cocaine in exchange for Cote's services tended to make it more probable that the purpose of the narcotics discovered in the New Britain residence was commercial rather than personal.

The court reasonably concluded that Cote's testimony that the defendant paid him in cocaine for his services as a handyman at the New Britain residence

therefore was relevant and material to several of the exceptions to the general bar against admitting prior misconduct evidence. See *State* v. *Franko*, supra, 142 Conn. App. 459–60. Cote's testimony was probative of the defendant's intent with respect to the narcotics in the New Britain residence, the defendant's possession of and intent to sell or distribute them, and the defendant's relationship with Cote. Additionally, the court did not abuse its discretion in finding that the probative value of the evidence provided by Cote about the barter transactions outweighed any possible risk to the defendant of undue prejudice. See id., 460. Accordingly, the court did not abuse its discretion in admitting the testimony.

### III

The defendant also claims that the court erred in denying his motion to suppress evidence and in applying the independent source doctrine to evidence observed during a search that violated his rights under the fourth and fourteenth amendments to the federal constitution. He argues that the court's finding that the officers at the Bristol residence did not share any information about it with the officers obtaining the warrant was clearly erroneous, and that information from the scene informed the decision to obtain, and contents of, the warrant. We disagree.

The following additional facts and procedural history are relevant. In the defendant's amended motion to suppress, he claimed that the police exceeded the scope of a legitimate protective sweep of the Bristol residence, and, therefore, any evidence seized during that search had to be suppressed. As noted, after the hearing on the defendant's motion, the court found that on arriving at the Bristol residence, the police looked into each room and closet in the apartment to ensure that evidence was not destroyed before the search warrant could be signed and delivered to the Bristol residence. Finding no one inside, the police remained in the Bristol residence while they waited for the search warrant to arrive. While they were waiting, however, the police searched the entire Bristol residence to locate and photograph contraband. The first time stamp from a photograph taken from inside the Bristol residence indicates that the photograph was taken at 8:41 p.m. Ennis, a department social worker, testified that the police called her at 9:12 p.m. to inform her that the defendant's home had been searched and that narcotics had been found, and that someone from the department should be dispatched to retrieve the defendant's child, who was present. However, although the police photographed items inside the apartment before the search warrant arrived, they did not seize or remove anything until it did. Furthermore, the court found that the police sought the search warrant for the Bristol residence because Cote had informed them that he had seen a gun and

cocaine in the defendant's possession there. No information collected at the scene was included in the application for the warrant except for a description of the outside of the Bristol residence. The warrant was signed at 9:29 p.m. that evening and delivered to the Bristol residence shortly afterward.

The court concluded that neither the protective sweep doctrine nor exigent circumstances supported the police's warrantless entries into and searches of the Bristol residence. The court further concluded, however, that the subsequent search and seizure of items in the apartment, made after the warrant was obtained, was valid under the independent source doctrine.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [trial court's] decision . . . ." (Internal quotation marks omitted.) *State* v. *Marrero-Alejandro*, 159 Conn. App. 376, 392, 122 A.3d 272, cert. granted on other grounds, 319 Conn. 934, 125 A.3d 207 (2015).

"It is axiomatic that [t]he Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment . . . guarantees [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Time and again, [the United States Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 631, 899 A.2d 1 (2006). The remedy for searches and seizures that violate the fourth amendment is suppression of evidence "if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Milotte*, 95 Conn. App. 616, 620, 897 A.2d 683 (2006), appeal dismissed, 281 Conn. 612, 917 A.2d 25 (2007) (certification improvidently granted); see *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

Nevertheless, "[i]t is well recognized that the exclusionary rule has no application [where] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. . . . The doctrine is based on the premise that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by

putting the police in the same, not a *worse*, position [than] they would have been in if no police error or misconduct had occurred. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 289–290, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

Particularly illuminating is the case of *Murray* v. *United States*, 487 U.S. 533, 541, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), in which the United States Supreme Court held that the independent source doctrine applied to evidence initially observed in plain view during an illegal entry and search but not physically seized until the officers returned with a valid warrant. In *Murray*, federal agents had been surveilling the defendant and a coconspirator as a result of information from informants. Id., 535. The agents saw them drive a truck and a camper into a warehouse in Boston. Id. The agents saw other individuals with a tractor-trailer rig and a long container, and the defendant and his coconspirator turned their own vehicles over to other drivers. Id. The agents then arrested the other drivers and searched the vehicles, which were found to contain marijuana. Id. The agents then broke into the warehouse and observed, but did not touch, several burlap covered bales that later were discovered to contain marijuana. Id. The agents left the warehouse and did not enter it again until they had obtained a warrant, which did not mention the initial entry into the warehouse and did not rely on any observations they made while they were inside the warehouse. Id., 536. After obtaining the warrant, the agents reentered the warehouse and seized the marijuana and other incriminating evidence. The Supreme Court held that the exclusionary rule did not apply to the marijuana, notwithstanding its discovery during the initial, unlawful entry: "Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (Emphasis in original.) Id., 541.

As a preliminary matter, we reject the defendant's argument that the court's factual finding that the officers at the Bristol residence did not share any informa-

tion about it with the officers obtaining the warrant was clearly erroneous. The defendant points out that Bennett, who was at the Bristol residence, admitted that he was in contact with state police Trooper Brian Marino, the task force member sent to obtain the warrant, throughout the day, but that Bennett claimed not to have shared any information about the Bristol residence. Marino, on the other hand, testified that Bennett described for him the outside of the Bristol residence. The defendant claims that this testimony is inconsistent in that "one officer acknowledges a dialogue about [the Bristol residence] with officers onsite while [another] denies it." As the defendant concedes, however, this discrepancy does not relate to the interior of the Bristol residence, and as such, it does not undermine the court's factual finding. The defendant did not claim, however, that the exterior of the Bristol residence was hidden, or that it otherwise was screened from public view, so the discrepancy, if any, related to a description that could have been provided by any member of the public. The court, in any event, was free to disregard whatever marginal impeachment value this alleged discrepancy in testimony presented. See *State* v. *Marcisz*, 99 Conn. App. 31, 36, 913 A.2d 436 ("[i]t is the [finder of fact's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 281 Conn. 922, 918 A.2d 273 (2007). Its finding, therefore, was not clearly erroneous in view of the evidence and the pleadings in the whole record.

We further conclude that the evidence seized from the Bristol residence under the search and seizure warrant should not be suppressed because the independent source doctrine was satisfied.

The court's findings satisfy the first prong of the test, which requires that the warrant be supported by probable cause derived from sources independent of the illegal entry. See *State* v. *Joyce*, supra, 243 Conn. 290. The court found that the warrant for the Bristol residence was supported by the results of the search of the New Britain residence, as well as Cote's statements that he had observed a gun and cocaine in the defendant's possession at the Bristol residence. The court further credited Marino's testimony that the only information included in the warrant from the scene was a description of the outside of the Bristol residence. Neither piece of information was derived from the police's warrantless entry and search of the Bristol residence. As in *Murray*, therefore, the warrant was supported by probable cause derived from sources independent of the illegal entry. See *United States* v. *Murray*, supra, 487 U.S. 541.

The court's findings also satisfy the second prong of the test set forth in *State* v. *Joyce*, supra, 243 Conn. 290, which requires that the decision to seek the warrant

not have been prompted by information gleaned from the illegal conduct. The information from the New Britain residential search and from Cote, and nothing else, spurred the police's decision to seek a warrant for the Bristol residence. This conclusion is bolstered by the court's finding that the police were awaiting the arrival of the warrant when they began photographing the residence's contents. As in *Murray*, the fact that the police rediscovered or seized any of the same evidence that they previously had found during their unlawful search does not change the result if that later acquisition was not the result of the earlier entry, but, rather, was the result of the search and seizure under a warrant supported by probable cause derived from an independent source. See *United States* v. *Murray*, supra, 487 U.S. 541. These requirements were met here. The court therefore did not err in denying the defendant's motion to suppress the evidence seized from the Bristol residence.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] The public safety exception to the requirement of prior *Miranda* warnings first was articulated in *New York* v. *Quarles*, 467 U.S. 649, 653, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984).

[2] Bennett asked the defendant whether there was anything in his vehicle that he, Bennett, needed to be concerned about. The defendant responded that there was cocaine in his vehicle.

[3] The transcript from the suppression hearing states in relevant part:

"[Defense Counsel]: And then you asked him if he had any contraband, correct?

"[Bennett]: Yes, sir. . . ."

[4] Furthermore, even if Bennett had used the word contraband in his question to the defendant, the United States Court of Appeals for the Second Circuit concluded in *United States* v. *Newton*, 369 F.3d 659, 679 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004), that "[a]lthough [the arresting officer's] inquiry about 'contraband' did not specifically refer to firearms, the term plainly encompassed such items." Though the word frequently refers to illegal substances, in situations such as the one faced by the officers in the present case, it clearly also includes weapons and other items that pose a physical threat. "[A] question need not be posed as narrowly as possible, because [p]recision crafting cannot be expected in the circumstances of a tense and dangerous arrest. . . . Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." (Citation omitted; internal quotation marks omitted.) *United States* v. *Estrada*, supra, 430 F.3d 612.

[5] See footnote 4 of this opinion.

[6] We note that even if we assume arguendo that Bennett's question did not fall within the public safety exception, the defendant would not necessarily be entitled to suppression of the *physical evidence* discovered as a result of his response. *United States* v. *Patane*, 542 U.S. 630, 633–634, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (holding that fruit of the poisonous tree doctrine does not apply to physical evidence obtained as a result of *Miranda* violations); see also *State* v. *Mangual*, 311 Conn. 182, 188 n.5, 85 A.3d 627 (2014) ("We also note that the defendant asserts, in passing, that the police likely would not have discovered the heroin hidden in the hairspray can if the defendant had not alerted the police to its existence. The defendant, however, has raised no claim that the heroin itself should be suppressed as a fruit of the *Miranda* violation. Indeed, a statement that is obtained in violation of *Miranda* does not require suppression of the physical fruits of the suspect's unwarned but otherwise voluntary statements.").

[7] Our Supreme Court has stated that "misconduct evidence may be used to complete the story of the charged crime by placing it in the context of

nearby and nearly contemporaneous happenings." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 427, 660 A.2d 337 (1995).

[8] See Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person"); *State* v. *Kantorowski*, 144 Conn. App. 477, 486, 72 A.3d 1228 ("[e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime" [internal quotation marks omitted]), cert. denied, 310 Conn. 924, 77 A.3d 141 (2013).